**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

TIM KARTH, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

KERYX BIOPHARMACEUTICALS, INC., RON BENTSUR, SCOTT A. HOLMES, GREGORY P. MADISON, and JAMES F. OLIVIERO,

Defendants.

Case No.: 1:16-cv-11745-DJC

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

Lead plaintiffs Tim Karth and Abraham Kiswani (together, "Lead Plaintiffs"), by and through their attorneys, allege upon personal knowledge as to themselves, and upon information and belief as to all other matters, based upon the investigation conducted by and through their attorneys, which included, among other things, a review of documents filed by Keryx Biopharmaceuticals, Inc. ("Keryx" or the "Company) with the United States Securities and Exchange Commission (the "SEC"), conference call transcripts, news reports, press releases issued by Defendants, certain analyst reports, and other publicly available information, as follows:

## NATURE AND SUMMARY OF THE ACTION

1. Keryx is a biopharmaceutical company which has one drug approved by the United States Food and Drug Administration ("FDA") for sale in the United States: Auryxia.[1] Keryx received FDA approval to sell Auryxia in September 2014 and began commercial sales in December 2014. Auryxia is a compound which controls a renal patient's phosphorus levels.[2] Keryx does not manufacture Auryxia in-house; instead it contracts out to a third-party the conversion of the active pharmaceutical ingredient ("API") to the finished drug product taken by patients. Since achieving FDA approval for the sale of Auryxia, Keryx has contracted with a single company, Norwich Pharmaceuticals, Inc. ("Norwich"), to convert the API into Auryxia tablets.

2. In its 2013 Form 10-K, filed with the SEC on March 12, 2013, Keryx informed its investors that "[u]ntil such time [Keryx engages a back-up supplier] we expect that we will rely

[1] Shortly before granting final approval for commercial sales, the FDA rescinded approval for ferric citrate's planned trade name of Zerenex, which the Company, until that point, had used extensively in SEC filings, conference calls and presentations. Following a brief period, during which the compound was referred to as Ferric Citrate, the drug was subsequently renamed Auryxia. Throughout this Complaint, references to "Zerenex" or "Ferric Citrate" have been changed to "[Auryxia]".

[2] A side effect of chronic kidney disease ("CKD") is the afflicted patient's inability to remove phosphorus from the blood, a task performed normally by fully functioning, healthy kidneys. Elevated phosphorus levels damage the body in sundry ways, including by drawing calcium from the bones, drastically weakening them as a result.

on a single contract manufacturer to produce Auryxia."[3] Prior to the start of the May 8, 2013 through August 1, 2016 class period (the "Class Period") investors were, therefore, informed that Keryx would rely on a single contract manufacturer and would seek to add a back-up manufacturer. Adding a second contract manufacturer, however, was more complicated than just executing a contract with another manufacturer; any new manufacturer would need FDA approval to convert the API into Auryxia before the product could be sold to the public.

3. On May 8, 2013, the start of the Class Period, Keryx filed its second quarter Form 10-Q in which it disclosed that: "***We rely on third <u>parties</u> to manufacture and analytically test our drug candidate. If these third <u>parties</u> do not successfully manufacture and test our drug candidate, our business will be harmed***. We intend to continue, in whole or in part, to use third **<u>parties</u>** to manufacture and analytically test our drug candidate for use in clinical trials and for future sales."

4. Defendants repeated this representation, that Keryx relied on third **<u>parties</u>** to manufacture Auryxia, throughout the Class Period. Plus, in its 2014 and 2015 Forms 10-K, Keryx deleted disclosures, found in its 2013 Form 10-K, that it employed a single contract manufacturer to convert the API into Auryxia and was attempting to secure a back-up manufacturer. Keryx's representations that it worked with "third **<u>parties</u>**" to manufacture Auryxia was knowingly false when made. During the Class Period, Keryx contracted with only one third party to convert the API into Auryxia. Defendants modified their disclosure language to alter their disclosures that Keryx was relying on a single contract manufacturer and, instead, misrepresented that they "rely on third parties" as opposed to a single "third party."

---

[3] *See, e.g.*, Form 10-K, filed with the SEC on March 12, 2013, at 12.

5. Defendants were well aware of the risks of Keryx relying on a single third-party manufacturer to produce Auryxia. In fact, shortly after receiving FDA approval to sell Auryxia, Keryx began working with the FDA to get a second contract manufacturer approved that could convert the API into Auryxia. Yet, Defendants never revealed that they were dependent on a single manufacturer to convert the API into Auryxia and were working with the FDA to have another such manufacturer approved.

6. Defendants concealed this material risk from its investors. Investors were never informed, prior to the close of the Class Period, that Keryx contracted with a single contract manufacturer and was working with the FDA to have a second manufacturer approved. Defendants' Class Period disclosures were, therefore knowingly false, materially misleading and or omitted to disclose material facts necessary to make those statements not misleading.

7. On August 1, 2016, the risk Keryx concealed from its investors materialized when it revealed that it:

> has determined that a supply interruption is going to **occur due to a production-related issue in converting API to finished drug product at its contract <u>manufacturer</u>**. This issue has resulted in variable production yields of finished drug product and, as a result, the company has exhausted its reserve of finished drug product. At this time, current inventories of Auryxia are not sufficient to ensure uninterrupted patient access to this medicine. The supply interruption does not affect the safety profile of currently available Auryxia. Keryx is working with its existing **<u>manufacturer</u>** to resolve the production-related issue and rebuild adequate supply. In addition, since approval of Auryxia in 2014, Keryx has been working to bring a secondary manufacturer online to supply finished drug product. The company recently filed for approval of this manufacturer with the U.S. Food and Drug Administration (FDA) and the FDA has assigned a Prescription Drug User Fee Act (PDUFA) action date of November 13, 2016. The company expects to restore adequate supply of Auryxia and to make Auryxia available to patients during the fourth quarter of 2016.

8. Keryx revealed that it was dependent on a single manufacturer, Norwich, to convert the API into Auryxia and that because Norwich experienced problems and could not convert the API into the finished product, Keryx would have to cease sales for a period of time.

9. Just a few months earlier, on April 28, 2016, Defendants had reaffirmed their strong guidance for Keryx's 2016 fiscal year:

> We are pleased to report that the fundamental[s] of Auryxia continue to remain strong across physicians, payers and patients. Now consistent with prior quarters we are seeing an increase in the breadth and depth of prescribing, resulting in increased adoption and positive clinical experience of Auryxia. Approximately 70% of Auryxia prescriptions are being paid at the pharmacy and approximately 74% of the co-pays are below $10. Meaning physicians continue to report high patient persistency rates of approximately 70% with no reported discontinuations due to lack of efficacy. With these fundamentals in place, along with the efforts of our expanded sales force ramping over the course in 2016, we are confident in our ability to achieve our net sales guidance.[4]

10. Yet, despite reassuring investors that they were seeing increased sales of Auryxia which would lead to the ability to achieve their net sales guidance, Defendants omitted to reveal that they had been aware of the production related issues at Norwich for "months" before the August 1, 2016 disclosure. Defendant Gregory Madison, on a conference call with investors on August 1, 2016, revealed that "***In [the] past few months***, we began experiencing difficulties converting active pharmaceutical ingredients, or API, to finish[ed] drug product, which resulted in variable yields, as compared to our historical rate. We had been manag[ing] supply levels efficiently **even with increased demand generated by our field team in the second quarter**."[5] (emphasis added).

---

[4] Keryx Biopharmaceuticals' (KERX) CEO Greg Madison on Q1 2016 Results - Earnings Call Transcript, available at http://seekingalpha.com/article/3968835-keryx-biopharmaceuticals-kerx-ceo-greg-madison-q1-2016-results-earnings-call-transcript?all=true&find=keryx, at 5.

[5] Keryx Biopharmaceuticals' (KERX) CEO Greg Madison on Q2 2016 Results - Earnings Call Transcript, available at http://seekingalpha.com/article/3994162-keryx-biopharmaceuticals-kerx-ceo-greg-madison-q2-2016-results-earnings-call-transcript?all=true&find=keryx, at 3.

11. On news of the August 1 disclosures, the Company's stock declined $2.64 per share, falling from a closing price of $7.36 on July 31, 2016 to close at $4.72 on August 1, 2016. The aggregate overnight loss to investors was approximately $280 million, or approximately 36% of the Company's value.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

14. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

15. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here. Additionally, many of the acts and practices complained of herein occurred in substantial part in this District, and witnesses and individual defendants are located in Massachusetts.

16. In connection with the acts, omissions, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

17. As set forth in his previously filed certification, incorporated by reference herein, Lead Plaintiff Timothy Karth acquired shares of the Company at artificially inflated prices during the Class Period and has been damaged thereby.

18. As set forth in his previously filed certification, incorporated by reference herein, Lead Plaintiff Abraham Kiswani acquired shares of the Company at artificially inflated prices during the Class Period and has been damaged thereby.

19. Defendant Keryx Biopharmaceuticals, Inc., is a Delaware corporation with its principal executive offices located at One Marina Park Drive, 12th Floor, Boston, Massachusetts 02210. The Company trades on the NASDAQ stock exchange under the ticker symbol "KERX" and is a biopharmaceutical company purportedly focused on providing therapies for patients with renal disease.

20. Defendant Ron Bentsur ("Bentsur") was the CEO and a director of Keryx from May 2009 to April 30, 2015. During the Class Period, Bentsur signed SEC filings containing false and misleading statements and made false and misleading statements in conference calls, press releases filed with the SEC on Forms 8-K and in other widely available materials relied upon by investors.

21. Defendant Scott A. Holmes ("Holmes") has been the Chief Financial Officer ("CFO") since July 2015. During the Class Period, Holmes signed SEC filings which contained false and misleading statements, and made false and misleading statements in conference calls, press releases filed with the SEC on Forms 8-K and in other widely available materials relied upon by investors.

22. Defendant Gregory P. Madison ("Madison") has been the CEO of Keryx since April 30, 2015 and has been a director of the Company since March 2015. During the Class Period,

Madison signed SEC filings and certifications containing false and misleading statements, and also made false and misleading statements in conference calls, press releases filed with the SEC on Forms 8-K and in other widely available materials relied upon by investors.

23. Defendant James F. Oliviero ("Oliviero") was the CFO of Keryx from May 2003 to July 2015. During the Class Period, Oliviero signed SEC filings which contained false and misleading statements, and also made false and misleading statements in conference calls, press releases filed with the SEC on Forms 8-K and in other widely available materials relied upon by investors.

24. Collectively, Bentsur, Holmes, Madison, and Oliviero are referred to throughout this complaint as the "Individual Defendants," and together with Keryx are referred to as "Defendants."

25. The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, conference calls and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, statements and materials alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions within the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## RELEVANT NON-PARTY

26. Norwich Pharmaceuticals, Inc. is a Delaware corporation with its principal office at 6826 State Highway 12, Norwich New York, 13815. Norwich executed a manufacturing services agreement with Keryx on January 17, 2014 to convert API into marketable products, a task it performed at a single location. Norwich was the Company's only active manufacturer at the time of the product supply disruption announced on August 1, 2016.

## SUBSTANTIVE ALLEGATIONS

### A. Background

27. Keryx is a Massachusetts-based biopharmaceutical company purportedly focused on developing treatments for patients with renal disease. Its valuation is dependent upon the success of Auryxia (ferric citrate), the Company's only product approved by the FDA for marketing and sale in the United States. Auryxia is an orally administered, absorbable iron-based compound taken to treat hyperphosphatemia, or elevated phosphorus levels, in patients with CKD on dialysis. The treatment of hyperphosphatemia is Auryxia's only approved indication.[6]

28. Keryx submitted its New Drug Application for Auryxia (at the time referred to as Zerenex) to the FDA in September 2013. A few months later, in January 2014, Keryx executed a contract with Norwich to convert Auryxia's API into finished drug product. Until November 2016, Keryx had only one contract manufacturer approved by the FDA to produce Auryxia.

29. The FDA approved Auryxia in September 2014, and Keryx began selling Auryxia in the United States in December 2014. Auryxia is Keryx's only marketed product in the United States and represents its only source of revenue. The Company has no foreign operations and

[6] Keryx recently submitted a supplemental New Drug Application with data from a recently completed Phase 3 study to the FDA for an Auryxia indication treating iron deficiency anemia in patients with non-dialysis dependent CKD.

stated, in its most recent Form 10-K, that "[s]ales of ferric citrate outside of the United States do not and are not expected to materially contribute to our revenues."[7]

30. CEO Madison has acknowledged that "We're not a research organization – it's more of a development and commercial type of organization" and as such, the Company does not have any new compounds in development.[8] It currently relies exclusively upon Auryxia, and possible new indications for Auryxia, for all of Keryx's expected future revenue. Aside from royalty payments in conjunction with licenses, Keryx's revenues are driven by its domestic sales, and its future growth is dependent upon its U.S. sales increasing.

31. On March 29, 2016, the Company announced positive top-line results for a Phase 3 study of Auryxia for the treatment of iron deficiency anemia in adults with non-dialysis dependent chronic kidney disease. Keryx's chief medical officer John Neylan, M.D., in a press release announcing the Phase 3 study's results, stated that "based on these results, we plan to submit an sNDA [supplemental New Drug Application] to the FDA in the third quarter, seeking to expand the label for ferric citrate to include the treatment of iron deficiency anemia in people with stage 3-5 NDD CKD [non-dialysis dependent chronic kidney disease]."[9]

**B. The Company's Pre-Class-Period Manufacturing Disclosures**

32. Each of the Company's quarterly and annual filings prior to the beginning of the Class Period informed investors that Keryx would contract with a third party to convert Auryxia's API into a finished product.

---

[7] Form 10-K filed with the SEC on February 26, 2016 at p. 4.

[8] Biotech Showcase 2016: Interview: Keryx reboots disappointing product launch, February 25, 2016 available at https://www.youtube.com/watch?v=CYZgv-k9C_Y

[9] *Keryx Biopharmaceuticals Announces Positive Top-Line Results From Pivotal Phase 3 Study of Ferric Citrate for the Treatment of Iron Deficiency Anemia in Adults with Non-Dialysis Dependent Chronic Kidney Disease*, issued on March 29, 2016.

33. For example, in its Form 10-K filed with the SEC on March 12, 2013, the Company disclosed manufacturing risks which could affect its prospects going forward. In a section of the Form 10-K entitled *Supply and Manufacturing*, Keryx stated that:

> We believe that we have established contract manufacturing relationships for the supply of [Auryxia] (ferric citrate) to ensure that we will have sufficient material for clinical trials and commercial launch. In addition, we are establishing the basis for long-term commercial production capabilities. We have committed to build inventory in anticipation for the launch of [Auryxia] in 2014…Prior to the time of commercial sale, to the extent possible and commercially practicable, **we intend to seek to engage back-up suppliers** for [Auryxia].[10]

34. However, the Company added to this statement the important disclaimer that "[u]ntil such time [as it engages a back-up supplier] we expect that we will rely on a single contract manufacturer to produce [Auryxia]."[11] Engaging a third party to convert Auryxia's API into a finished product required more than Keryx simply reaching an agreement with a third party: the FDA had to approve any such manufacturer. Therefore, relying on a single contract manufacturer to produce Auryxia exposed Keryx to significant risks: (1) if the manufacturer encountered production problems or delays, Keryx's abililty to sell its only product would cease; and (2) if the manufacturer no longer agreed to convert the API into Auryxia, Keryx's ability to sell its only product would cease. In short, Keryx was exposed to the same risk as any company that is highly dependent on a single customer to buy its product. Here, the risk is sole dependence on a company to make the product versus a sole company to buy the product. In either case, these are material facts required to be disclosed to investors. Keryx, however, concealed and misrepresented these facts.

[10] Form 10-K filed with the SEC on March 12, 2013, at p. 12. Unless otherwise noted, all emphasis has been added by counsel.

[11] *Id*.

**C. The False and Misleading Statements**

***The Class Period Begins***

35. The Class Period begins on May 8, 2013. The May 8, 2013 Form 10-Q (the "2013 Second Quarter 10-Q"), signed by Defendant Oliviero, contained the following false and misleading statements in a subpart to *Item 1A Risk Factors*.

> ***We rely on third <u>parties</u> to manufacture and analytically test our drug candidate. If these third <u>parties</u> do not successfully manufacture and test our drug candidate, our business will be harmed.***
>
> We have limited experience in manufacturing products for clinical or commercial purposes. *We intend to continue, in whole or in part, to use third* ***<u>parties</u>*** *to manufacture and analytically test our drug candidate for use in clinical trials and for future sales.* We may not be able to enter into future contract agreements with these **<u>third-parties</u>** on terms acceptable to us, if at all.
>
> Our ability to conduct clinical trials and commercialize our drug candidate will depend on the ability of such third **<u>parties</u>** to manufacture our drug candidate on a large scale at a competitive cost and in accordance with current Good Manufacturing Practices, or cGMP, and other regulatory requirements, including requirements from federal, state and local environmental and safety regulatory agencies and foreign regulatory requirements, if applicable. Prior to approval, we will need to complete validation studies that the FDA must review and approve. Significant scale-up of manufacturing may result in unanticipated technical challenges and may require additional validation studies that the FDA must review and approve. Contract **<u>manufacturers</u>** often encounter difficulties in scaling up production, including problems involving raw material supplies, production yields, scaled-up product characteristics, quality control and assurance, shortage of qualified personnel, capacity constraints, changing priorities within the contract **<u>manufacturers</u>**, compliance with FDA and foreign regulations, environmental compliance, production costs and development of advanced manufacturing techniques and process controls. Any of these difficulties, if they occur, and are not overcome to the satisfaction of the FDA or other regulatory agency, could lead to significant delays and possibly the termination of the development program for our drug candidate. These risks become more acute as we scale up for commercial quantities, where a reliable source of raw material supplies becomes critical to commercial success. For example, given the large quantity of materials required for ferric citrate production, as we approach commercialization for [Auryxia] we will need to ensure an adequate supply of starting materials that meet quality, quantity and cost standards. Failure to achieve this level of supply can jeopardize the successful commercialization of the product. Moreover, issues that may arise in our current transition to commercial batch sizes with our third party **<u>manufacturers</u>** of [Auryxia] can lead to delays in our development timelines.

> **<u>Our third-party manufacturers</u>** may not perform as agreed or may not remain in the contract manufacturing business for the time required by us to successfully produce and market our drug candidate. In addition, **<u>our contract manufacturers</u>** will be subject to ongoing periodic and unannounced inspections by the FDA and corresponding foreign governmental agencies to ensure strict compliance with cGMP, as well as other governmental regulations and corresponding foreign standards. While we periodically audit **<u>our contractors</u>** for adherence to regulatory requirements, we cannot assure you that unforeseen changes at these **<u>contractors</u>** will not occur that could change their regulatory standing. The same issues apply to contract analytical services which we use for testing of our drug candidate. We will not have control over, other than by contract and periodic oversight, third-party **<u>manufacturers'</u>** compliance with these regulations and standards. We are currently developing analytical tools for ferric citrate drug substance and drug product testing. Failure to develop effective analytical tools could result in regulatory or technical delay or could jeopardize our ability to obtain FDA approval. Moreover, even with effective analytical tooling available, there is no assurance that we will be able to analyze all the raw materials and qualify all impurities to the satisfaction of the FDA, possibly requiring additional analytical studies, analytical method development, or preclinical studies, which could significantly delay our ability to file an NDA or receive regulatory approval for our drug candidate. Additionally, changes in the analytical specifications required by the FDA or other regulatory authority, such as United States Pharmacopeial Convention standards, from time to time, could delay our ability to file an NDA or receive regulatory approval for our drug candidate. Switching or engaging multiple third-party **<u>contractors</u>** to produce our drug substance or drug product may be difficult because the number of potential **<u>manufacturers</u>** may be limited and the process by which **<u>multiple manufacturers</u>** make the drug substance or drug product must meet established specifications at **<u>each manufacturing facility</u>**. It may be difficult for us to find and engage replacement or multiple manufacturers quickly and on terms acceptable to us, if at all. For [Auryxia], the loss of any of our drug substance or drug product **<u>manufacturers</u>** would result in significant additional costs and delays in our development program. Moreover, if we need to add or change **<u>manufacturers</u>** after commercialization, the FDA and corresponding foreign regulatory agencies must approve any new **<u>manufacturers</u>** in advance, which will involve testing and additional inspections to ensure compliance with FDA and foreign regulations and standards.[12]

36. While Defendants properly warned investors that if they lost their drug product manufacturer it might result in significant additional costs and delays, Defendants concealed the true risk that Keryx was dependent on a single manufacturer to convert its API into Auryxia. This

[12] Form 10-Q filed with the SEC on May 8, 2013 at 23-24. Section heading emphasis in original.

statement was false and materially misleading when made because: (1) Keryx misrepresented that it relied on third parties—plural—to manufacture Auryxia when, in fact, it relied on a single contract manufacturer; (2) this statement was materially misleading as it conveyed that Keryx relied on more than one third party manufacturer to convert its API into Auryxia when it only contracted with one such manufacturer; and (3) it omitted from disclosure the material fact that Keryx only contracted with one manufacturer to convert its API into Auryxia, which was necessary to make the statements made by Keryx not materially misleading.

***The August 2, 2013 False and Misleading Statements***

37. The August 2, 2013 Form 10-Q, signed by Defendant Oliviero, contained the following false and misleading statements in a subpart to *Item 1A Risk Factors*.

> ***We rely on third parties to manufacture and analytically test our drug candidate. If these third parties do not successfully manufacture and test our drug candidate, our business will be harmed.***
>
> We have limited experience in manufacturing products for clinical or commercial purposes. We intend to continue, in whole or in part, to use third **parties** to manufacture and analytically test our drug candidate for use in clinical trials and for future sales. We may not be able to enter into future contract agreements with these **third-parties** on terms acceptable to us, if at all.
>
> Our ability to conduct clinical trials, manufacture and commercialize our drug candidate will depend on the ability of such third **parties** to manufacture our drug candidate on a large scale at a competitive cost and in accordance with current Good Manufacturing Practices, or cGMP, and other regulatory requirements, including requirements from federal, state and local environmental and safety regulatory agencies and foreign regulatory requirements, if applicable. Prior to approval, the FDA must review and approve our validation studies for drug substance and drug product. Significant scale-up of manufacturing may result in unanticipated technical challenges and may require additional validation studies that the FDA must review and approve. **Contract manufacturers** often encounter difficulties in scaling up production, including problems involving raw material supplies, production yields, technical difficulties, scaled-up product characteristics, quality control and assurance, shortage of qualified personnel, capacity constraints, changing priorities within the **contract manufacturers**, compliance with FDA and foreign regulations, environmental compliance, production costs and development of advanced manufacturing techniques and process controls. Any of these difficulties, if they occur, and are not overcome to the satisfaction of the FDA or

other regulatory agency, could lead to significant delays and possibly the termination of the development program for our drug candidate. These risks become more acute as we scale up for commercial quantities, where a reliable source of raw material supplies becomes critical to commercial success. For example, given the large quantity of materials required for ferric citrate production, as we approach commercialization for [Auryxia] we will need to ensure an adequate supply of starting materials that meet quality, quantity and cost standards. Failure to achieve this level of supply can jeopardize and prevent the successful commercialization of the product. Moreover, issues that may arise in our current transition to commercial batch sizes with our third party manufacturers of [Auryxia] can lead to significant delays in our development timelines.

**Our third-party manufacturers** may not perform as agreed or may not remain in the contract manufacturing business for the time required by us to successfully produce and market our drug candidate. In addition, **our contract manufacturers** will be subject to ongoing periodic and unannounced inspections by the FDA and corresponding foreign governmental agencies to ensure strict compliance with cGMP, as well as other governmental regulations and corresponding foreign standards. While we periodically audit **our contractors** for adherence to regulatory requirements, and are ultimately held responsible for their regulatory compliance, we cannot assure you that unforeseen changes at these **contractors** will not occur that could change their regulatory standing. The same issues apply to contract analytical services which we use for quality, impurity and release testing of our drug candidate. We are required by law to have adequate control over raw materials, components and finished products furnished by **our third-party manufacturers**, which we establish by contract and through periodic oversight, but unforeseen circumstances could affect **our third-party manufacturers'** compliance with applicable regulations and standards. We are currently developing analytical tools for ferric citrate drug substance and drug product testing. Failure to develop effective analytical tools could result in regulatory or technical delay or could jeopardize our ability to obtain FDA approval. Moreover, even with effective analytical methods available, there is no assurance that we will be able to analyze all the raw materials and qualify all impurities to the satisfaction of the FDA, possibly requiring additional analytical studies, analytical method development, or preclinical studies, which could significantly delay our ability to file an NDA or receive regulatory approval for our drug candidate. Additionally, changes in the analytical specifications required by the FDA or other regulatory authority, such as United States Pharmacopeial Convention standards, from time to time, could delay our ability to file an NDA or receive regulatory approval for our drug candidate. Switching or engaging multiple third-party **contractors** to produce our drug substance or drug product may be difficult and time consuming because the number of potential **manufacturers** may be limited and the process by which **multiple manufacturers** make the drug substance or drug product must meet established specifications at **each manufacturing facility**. It may be difficult and time consuming for us to find and engage replacement or multiple manufacturers quickly and on terms acceptable to us, if at all. For [Auryxia], the loss of any of our drug substance or **drug product manufacturers** would result in significant additional

> costs and delays in our development program. Moreover, if we need to add or change **manufacturers** after commercialization, the FDA and corresponding foreign regulatory agencies must approve any new **manufacturers** in advance, which will involve testing and additional inspections to ensure compliance with FDA and foreign regulations and standards.[13]

38. This statement was false and materially misleading when made because: (1) Keryx misrepresented that it relied on third parties—plural—to manufacture Auryxia when, in fact, it relied on a single contract manufacturer; (2) this statement was materially misleading as it conveyed that Keryx relied on more than one third party manufacturer to convert its API into Auryxia when it only contracted with one such manufacturer; and (3) it omitted from disclosure the material fact that Keryx only contracted with one manufacturer to convert its API into Auryxia, which was necessary to make the statements made by Keryx not materially misleading.

***The November 4, 2013 False and Misleading Statements***

39. The November 4, 2013 Form 10-Q, signed by Defendant Oliviero, contained the following false and misleading statements in a subpart to *Item 1A Risk Factors*.

> ***We rely on third parties to manufacture and analytically test our drug candidate. If these third parties do not successfully manufacture and test our drug candidate, our business will be harmed.***
>
> We have limited experience in manufacturing products for clinical or commercial purposes. We intend to continue, in whole or in part, to use third **parties** to manufacture and analytically test our drug candidate for use in clinical trials and for future sales. We may not be able to enter into future contract agreements with these **third-parties** on terms acceptable to us, if at all.
>
> Our ability to conduct clinical trials, manufacture and commercialize our drug candidate will depend on the ability of such third **parties** to manufacture our drug candidate on a large scale at a competitive cost and in accordance with current Good Manufacturing Practices, or cGMP, and other regulatory requirements, including requirements from federal, state and local environmental and safety regulatory agencies and foreign regulatory requirements, if applicable. Prior to approval, the FDA must review and approve our validation studies for drug substance and drug product. Significant scale-up of manufacturing may result in unanticipated

[13] Form 10-Q filed with the SEC on August 2, 2013 at p. 25. Section heading emphasis in original.

technical challenges and may require additional validation studies that the FDA must review and approve. **Contract manufacturers** often encounter difficulties in scaling up production, including problems involving raw material supplies, production yields, technical difficulties, scaled-up product characteristics, quality control and assurance, shortage of qualified personnel, capacity constraints, changing priorities within the **contract manufacturers**, compliance with FDA and foreign regulations, environmental compliance, production costs and development of advanced manufacturing techniques and process controls. Any of these difficulties, if they occur, and are not overcome to the satisfaction of the FDA or other regulatory agency, could lead to significant delays and possibly the termination of the development program for our drug candidate. These risks become more acute as we scale up for commercial quantities, where a reliable source of raw material supplies and drug substance and drug product processes become critical to commercial success. For example, given the large quantity of materials required for [Auryxia] production and the large quantities of [Auryxia] that will be required for commercial success, the commercial viability of [Auryxia], if approved, will also depend on adequate supply of starting materials that meet quality, quantity and cost standards and the ability of **our contract manufacturers** to produce drug substance and drug product in large scale. Failure to achieve this level of supply can jeopardize and prevent the successful commercialization of the product. Moreover, issues that may arise in our current transition to commercial batch sizes with **our third party manufacturers** of [Auryxia] can lead to significant delays in our development timelines.

**Our third-party manufacturers** may not perform as agreed or may not remain in the contract manufacturing business for the time required by us to successfully produce and market our drug candidate. In addition, **our contract manufacturers** will be subject to ongoing periodic and unannounced inspections by the FDA and corresponding foreign governmental agencies to ensure strict compliance with cGMP, as well as other governmental regulations and corresponding foreign standards. While we periodically audit **our contractors** for adherence to regulatory requirements, and are ultimately held responsible for their regulatory compliance, we cannot assure you that unforeseen changes at these **contractors** will not occur that could change their regulatory standing. The same issues apply to contract analytical services which we use for quality, impurity and release testing of our drug candidate. We are required by law to have adequate control over raw materials, components and finished products furnished by **our third-party manufacturers**, which we establish by contract and through periodic oversight, but unforeseen circumstances could affect **our third-party manufacturers'** compliance with applicable regulations and standards. As we continue to scale up production, we continue to develop analytical tools for ferric citrate drug substance and drug product testing. Failure to develop effective analytical tools could result in regulatory or technical delay or could jeopardize our ability to obtain FDA approval. Moreover, even with effective analytical methods available, there is no assurance that we will be able to analyze all the raw materials and qualify all impurities to the satisfaction of the FDA, possibly requiring additional analytical studies, analytical method development, or preclinical studies, which could

> significantly delay our ability to receive regulatory approval for our drug candidate. Additionally, changes in the analytical specifications required by the FDA or other regulatory authority, such as United States Pharmacopeial Convention standards, from time to time, could delay our ability to receive regulatory approval for our drug candidate. Switching or engaging **multiple third-party contractors** to produce our drug substance or drug product may be difficult and time consuming because the number of potential **manufacturers** may be limited and the process by which multiple **manufacturers** make the drug substance or drug product must meet established specifications at **each manufacturing facility**. It may be difficult and time consuming for us to find and engage replacement or **multiple manufacturers** quickly and on terms acceptable to us, if at all. For [Auryxia], the loss of **any of our** drug substance or **drug product manufacturers** would result in significant additional costs and delays in our development program. Moreover, if we need to add or change **manufacturers** after commercialization, the FDA and corresponding foreign regulatory agencies must approve any new **manufacturers** in advance, which will involve testing and additional inspections to ensure compliance with FDA and foreign regulations and standards.[14]

40. This statement was false and materially misleading when made because: (1) Keryx misrepresented that it relied on third parties—plural—to manufacture Auryxia when, in fact, it relied on a single contract manufacturer; (2) this statement was materially misleading as it conveyed that Keryx relied on more than one third party manufacturer to convert its API into Auryxia when it only contracted with one such manufacturer; and (3) it omitted from disclosure the material fact that Keryx only contracted with one manufacturer to convert its API into Auryxia, which was necessary to make the statements made by Keryx not materially misleading.

***The January 23, 2014 False and Misleading Statements***

41. On January 23, 2014, Keryx filed with the SEC a false and materially misleading Final Prospectus Supplement to the Company's Prospectus dated August 16, 2013. In a section entitled **Risks associated with our product development efforts**, the Prospectus discloses as follows:

> ***We rely on third parties to manufacture and analytically test our drug candidate. If these third parties do not successfully manufacture and test our drug candidate, our business will be harmed.***

[14] Form 10-Q filed with the SEC on November 4, 2013 at 27-28. Section heading emphasis in original.

We have limited experience in manufacturing products for clinical or commercial purposes. *We intend to continue, in whole or in part, to use third* ***parties*** *to manufacture and analytically test our drug candidate for use in clinical trials and for future* sales. We may not be able to enter into future contract agreements with these **third-parties** on terms acceptable to us, if at all.

Our ability to conduct clinical trials, manufacture and commercialize our drug candidate will depend on the ability of such third **parties** to manufacture our drug candidate on a large scale at a competitive cost and in accordance with current Good Manufacturing Practices, or cGMP, and other regulatory requirements, including requirements from federal, state and local environmental and safety regulatory agencies and foreign regulatory requirements, if applicable. Prior to approval, the FDA must review and approve our validation studies for drug substance and drug product. Significant scale-up of manufacturing may result in unanticipated technical challenges and may require additional validation studies that the FDA must review and approve. *Contract manufacturers often encounter difficulties in scaling up production, including problems involving raw material supplies, production yields, technical difficulties, scaled-up product characteristics, quality control and assurance, shortage of qualified personnel, capacity constraints, changing priorities within the contract manufacturers, compliance with FDA and foreign regulations, environmental compliance, production costs and development of advanced manufacturing techniques and process controls. Any of these difficulties, if they occur, and are not overcome to the satisfaction of the FDA or other regulatory agency, could lead to significant delays and possibly the termination of the development program for our drug candidate.* These risks become more acute as we scale up for commercial quantities, where a reliable source of raw material supplies and drug substance and drug product processes become critical to commercial success. For example, given the large quantity of materials required for [Auryxia] production and the large quantities of [Auryxia] that will be required for commercial success, the commercial viability of [Auryxia], if approved, will also depend on adequate supply of starting materials that meet quality, quantity and cost standards and the ability of **our contract manufacturers** to produce drug substance and drug product in large scale. Failure to achieve this level of supply can jeopardize and prevent the successful commercialization of the product. Moreover, issues that may arise in our current transition to commercial batch sizes with **our third party manufacturers** of [Auryxia] can lead to significant delays in our development timelines.

**Our third-party manufacturers** may not perform as agreed or may not remain in the contract manufacturing business for the time required by us to successfully produce and market our drug candidate. In addition, **our contract manufacturers** will be subject to ongoing periodic and unannounced inspections by the FDA and corresponding foreign governmental agencies to ensure strict compliance with cGMP, as well as other governmental regulations and corresponding foreign standards. While we periodically audit **our contractors** for adherence to regulatory requirements, and are ultimately held responsible for their regulatory compliance,

we cannot assure you that unforeseen changes at **these contractors** will not occur that could change their regulatory standing. The same issues apply to contract analytical services which we use for quality, impurity and release testing of our drug candidate. We are required by law to have adequate control over raw materials, components and finished products furnished by **our third-party manufacturers**, which we establish by contract and through periodic oversight, but unforeseen circumstances could affect **our third-party manufacturers'** compliance with applicable regulations and standards. As we continue to scale up production, we continue to develop analytical tools for ferric citrate drug substance and drug product testing. Failure to develop effective analytical tools could result in regulatory or technical delay or could jeopardize our ability to obtain FDA approval. Moreover, even with effective analytical methods available, there is no assurance that we will be able to analyze all the raw materials and qualify all impurities to the satisfaction of the FDA, possibly requiring additional analytical studies, analytical method development, or preclinical studies, which could significantly delay our ability to receive regulatory approval for our drug candidate. Additionally, changes in the analytical specifications required by the FDA or other regulatory authority, such as United States Pharmacopeial Convention standards, from time to time, could delay our ability to receive regulatory approval for our drug candidate. Switching or engaging **multiple third-party contractors** to produce our drug substance or drug product may be difficult and time consuming because the number of potential manufacturers may be limited and the process by which multiple manufacturers make the drug substance or drug product must meet established specifications at each manufacturing facility. It may be difficult and time consuming for us to find and engage replacement or multiple manufacturers quickly and on terms acceptable to us, if at all. *For [Auryxia], the loss of any of our drug substance or* ***drug product manufacturers*** *would result in significant additional costs and delays in our development program.* Moreover, if we need to add or change manufacturers after commercialization, the FDA and corresponding foreign regulatory agencies must approve any new manufacturers in advance, which will involve testing and additional inspections to ensure compliance with FDA and foreign regulations and standards.

If we do not establish or maintain manufacturing, drug development and marketing arrangements with third parties, we may be unable to commercialize our products.

We do not possess all of the capabilities to fully commercialize our product on our own. From time to time, we may need to contract with additional third parties, or renew or revise contracts with existing third parties, to:

- manufacture our product candidate;
- assist us in developing, testing and obtaining regulatory approval for and commercializing our compound and technologies; and
- market and distribute our drug product.[15]

---

[15] Prospectus Supplement (to prospectus dated August 16, 2013), filed with the SEC on Form 424B5 on January 23, 2014 at S-11–S-12. Section heading emphasis in original.

42. Keryx's statements in its Final Prospectus Supplement were false and misleading when made because: (1) Keryx misrepresented that it relied on third-party contractors/manufacturers—plural—to manufacture Auryxia when, in fact, it relied on a single contract manufacturer; (2) this statement was materially misleading as it conveyed that Keryx relied on more than one third party manufacturer to convert its API into Auryxia when it only contracted with one such manufacturer; and (3) it omitted from disclosure the material fact that Keryx only contracted with one manufacturer to convert its API into Auryxia, which was necessary to make the statements made by Keryx not materially misleading..

***The March 13, 2014 False and Misleading Statements***

43. On March 13, 2014, Keryx filed with the SEC a false and materially misleading Form 10-K signed by Defendants Bentsur and Oliviero. In a subpart entitled **Supply and Manufacturing**, the March 13, 2014 Form 10-K (the "2013 Form 10-K") contained the following false and misleading statements regarding the number of the Company's manufacturers, manufacturing facilities and contracted third parties:

> **SUPPLY AND MANUFACTURING**
>
> We have limited experience in manufacturing products for clinical or commercial purposes. *We intend to continue, in whole or in part, to use third* ***<u>parties</u>*** *to manufacture and analytically test our drug candidate for use in clinical trials and for future sales.*
>
> We believe that we have established contract manufacturing **<u>relationships</u>** for the supply of [Auryxia] to ensure that we will have sufficient material for clinical trials and commercial launch. In addition, we are establishing the basis for long-term commercial production capabilities. We have committed to build inventory in anticipation for the launch of [Auryxia] in 2014. As with any supply program, obtaining raw materials of the required quality and quantity cannot be guaranteed and we cannot ensure that we will be successful in this endeavor.
>
> Prior to the time of commercial sale, to the extent possible and commercially practicable, we intend to seek to engage additional <u>suppliers</u> for [Auryxia] to produce [Auryxia] under current Good Manufacturing Practice, or cGMP, regulations. **<u>Our third-party manufacturers</u>** have a limited number of facilities in which [Auryxia] can be produced and will have limited experience in

> manufacturing [Auryxia] in quantities sufficient for commercialization. **Our third-party manufacturers** will have other clients and may have other priorities that could affect their ability to perform the work satisfactorily and/or on a timely basis. Both of these occurrences would be beyond our control.
>
> We expect to similarly rely on **contract manufacturing relationships** for any products that we may in-license or acquire in the future., there can be no assurance that we will be able to successfully contract with such manufacturers on terms acceptable to us, or at all.
>
> Contract manufacturers are subject to ongoing periodic and unannounced inspections by the FDA, the Drug Enforcement Administration and corresponding state and foreign government agencies to ensure strict compliance with cGMP and other state and federal regulations and corresponding foreign standards. Any of our contractors in Europe face similar challenges from the numerous European Union and member state regulatory agencies and authorized bodies. We do not have control over third-party manufacturers' compliance with these regulations and standards, other than through contractual obligations and periodic auditing. If they are deemed out of compliance with cGMPs, approvals could be delayed, product recalls could result, inventory could be destroyed, production could be stopped and supplies could be delayed or otherwise disrupted.
>
> If we need to change manufacturers after commercialization, the FDA and corresponding foreign regulatory agencies must approve these new manufacturers in advance, which will involve testing and additional inspections to compliance with FDA regulations and standards and may require significant lead times and delay, and disruption of supply. Furthermore, switching manufacturers may be difficult because the number of potential manufacturers is limited. It may be difficult or impossible for us to find a replacement manufacturer quickly or on terms acceptable to us, or at all.[16]

44. The March 13, 2014 Form 10-K was intentionally false and misleading. First, Keryx deleted a reference to relying upon a single contract manufacturer.

45. The March 12, 2013 Form 10-K read:

> Prior to the time of commercial sale, to the extent possible and commercially practicable, we intend to seek to engage back-up suppliers for [Auryxia]. **Until such time, we expect that we will rely on a contract manufacturer to produce** [Auryxia] under current Good Manufacturing Practice, or cGMP, regulations.[17]

---

[16] Form 10-K, filed with the SEC on March 13, 2014 at 15. Section heading emphasis in original.

[17] Form 10-K, filed with the SEC on March 12, 2013 at 12.

46. By removing the bolded disclosure, Keryx no longer informed investors that it was dependent on a single contract manufacturer of the API. This created the misleading impression that Keryx was no longer subject to the risk of being dependent on a single contract manufacturer.

47. Second, added to the first paragraph of the **Supply and Manufacturing** subsection is a sentence, not found in previous Forms 10-K, which stated:

> We intend to continue, in whole or in part, to use third **parties** to manufacture and analytically test our drug candidate for use in clinical trials and for future sales."[18]

48. This statement was false and materially misleading when made because: (1) Keryx misrepresented that it relied on third parties—plural—to manufacture Auryxia when, in fact, it relied on a single contract manufacturer; (2) this statement was materially misleading as it conveyed that Keryx relied on more than one third party manufacturer to convert its API into Auryxia when it only contracted with one such manufacturer; and (3) it omitted from disclosure the material fact that Keryx only contracted with one manufacturer to convert its API into Auryxia, which was necessary to make the statements made by Keryx not materially misleading.

49. Other portions of the March 13, 2014, Form 10-K contained false and misleading statements regarding the Company's manufacturers. For example, it states:

- It may be difficult for **our manufacturers** or us to comply with the applicable cGMP, as interpreted by the FDA, and other FDA regulatory requirements.[19]
- If we, or **our contract manufacturers**, fail to comply, then the FDA may not allow us to market products that have been affected by the failure.[20]
- For example, given the large quantity of materials required for [Auryxia] production and the large quantities of [Auryxia] that will be required for commercial success, the commercial viability of [Auryxia], if approved, will also depend on adequate supply of starting materials that meet quality, quantity and cost

---

[18] *Id*.

[19] *Id*. at 18.

[20] *Id*. at 17.

standards and the ability of **our contract manufacturers** to produce drug substance and drug product in large scale.[21]

- Moreover, issues that may arise in our current transition to commercial batch sizes with **our third party manufacturers** of [Auryxia] can lead to delays in our development timelines.[22]
- **Our third-party manufacturers** may not perform as agreed or may not remain in the contract manufacturing business for the time required by us to successfully produce and market our drug candidate. In addition, **our contract manufacturers** will be subject to ongoing periodic and unannounced inspections by the FDA and corresponding foreign governmental agencies.[23]
- We are required by law to have adequate control over raw materials, components and finished products furnished by **our third-party manufacturers**, which we establish by contract and through periodic oversight, but unforeseen circumstances could affect **our third-party manufacturers'** compliance with applicable regulations and standards.[24]
- For [Auryxia], the loss of any of our drug substance or **drug product manufacturers** would result in significant additional costs and delays in our development program.[25]
- [O]ur manufacturing processes, facilities or analytical methods or those of **our third party contract manufacturers** [] may lead to significant delays in the approval of [Auryxia] or to the rejection of the [Auryxia] NDA.[26]
- We rely on third **parties** to manufacture and analytically test our drug candidate. If these third **parties** do not successfully manufacture and test our drug candidate, our business will be harmed.[27]
- We intend to continue, in whole or in part, to use third **parties** to manufacture and analytically test our drug candidate for use in clinical trials and for future sales. We may not be able to enter into future contract agreements with these third-**parties** on terms acceptable to us, if at all.[28]

---

[21] *Id*. at 23.

[22] *Id*.

[23] *Id*.

[24] *Id*.

[25] *Id*.

[26] *Id*. at 20.

[27] *Id*. at 22.

[28] *Id*.

50. Each of these statements identified in paragraphs 43 through 49 were false when made and were misleading to shareholders because: (1) Keryx misrepresented that it relied on manufacturers/third parties—plural—to manufacture Auryxia when, in fact, it relied on a single contract manufacturer; (2) this statement was materially misleading as it conveyed that Keryx relied on more than one third party manufacturer to convert its API into Auryxia when it only contracted with one such manufacturer; and (3) it omitted from disclosure the material fact that Keryx only contracted with one manufacturer to convert its API into Auryxia, which was necessary to make the statements made by Keryx not materially misleading.

***The May 8, 2014 False and Misleading Statements***

51. The May 8, 2014 Form 10-Q, signed by Defendant Oliviero, contained the following false and misleading statements in a subpart to *Item 1A Risk* Factors.

> ***We rely on third <u>parties</u> to manufacture and analytically test our drug candidate. If these third <u>parties</u> do not successfully manufacture and test our drug candidate, our business will be harmed.***
>
> We have limited experience in manufacturing products for clinical or commercial purposes. We intend to continue, in whole or in part, to use third **<u>parties</u>** to manufacture and analytically test our drug candidate for use in clinical trials and for future sales. We may not be able to enter into future contract agreements with these **<u>third-parties</u>** on terms acceptable to us, if at all.
>
> Our ability to conduct clinical trials, manufacture and commercialize our drug candidate will depend on the ability of such third **<u>parties to manufacture our drug candidate</u>** on a large scale at a competitive cost and in accordance with current Good Manufacturing Practices, or cGMP, and other regulatory requirements, including requirements from federal, state and local environmental and safety regulatory agencies and foreign regulatory requirements, if applicable. Prior to approval, the FDA must review and approve our validation studies for drug substance and drug product. Significant scale-up of manufacturing may result in unanticipated technical challenges and may require additional validation studies that the FDA must review and approve. **<u>Contract manufacturers</u>** often encounter difficulties in scaling up production, including problems involving raw material supplies, production yields, technical difficulties, scaled-up product characteristics, quality control and assurance, shortage of qualified personnel, capacity constraints, changing priorities within the contract manufacturers, compliance with FDA and foreign regulations, environmental compliance, production costs and development of advanced manufacturing techniques and process controls. Any of these

difficulties, if they occur, and are not overcome to the satisfaction of the FDA or other regulatory agency, could lead to significant delays and possibly the termination of the development program for our drug candidate, particularly given that some of the third **parties** we employ in the manufacturing process are single source providers. These risks become more acute as we scale up for commercial quantities, where a reliable source of raw material supplies and drug substance and drug product processes become critical to commercial success. For example, given the large quantity of materials required for [Auryxia] production and the large quantities of [Auryxia] that will be required for commercial success, the commercial viability of [Auryxia], if approved, will also depend on adequate supply of starting materials that meet quality, quantity and cost standards and the ability of **our contract manufacturers** to produce drug substance and drug product in large scale. Failure to achieve this level of supply can jeopardize and prevent the successful commercialization of the product. Moreover, issues that may arise in our current transition to commercial batch sizes with **our third party manufacturers** of [Auryxia] can lead to significant delays in our development timelines.

**Our third-party manufacturers** may not perform as agreed or may not remain in the contract manufacturing business for the time required by us to successfully produce and market our drug candidate. In addition, **our contract manufacturers** will be subject to ongoing periodic and unannounced inspections by the FDA and corresponding foreign governmental agencies to ensure strict compliance with cGMP, as well as other governmental regulations and corresponding foreign standards. While we periodically audit **our contractors** for adherence to regulatory requirements, and are ultimately held responsible for their regulatory compliance, we cannot assure you that unforeseen changes at **these contractors** will not occur that could change their regulatory standing. The same issues apply to contract analytical services which we use for quality, impurity and release testing of our drug candidate. We are required by law to have adequate control over raw materials, components and finished products furnished by **our third-party manufacturers**, which we establish by contract and through periodic oversight, but unforeseen circumstances could affect **our third-party manufacturers'** compliance with applicable regulations and standards. As we continue to scale up production, we continue to develop analytical tools for ferric citrate drug substance and drug product testing. Failure to develop effective analytical tools could result in regulatory or technical delay or could jeopardize our ability to obtain FDA approval. Moreover, even with effective analytical methods available, there is no assurance that we will be able to analyze all the raw materials and qualify all impurities to the satisfaction of the FDA, possibly requiring additional analytical studies, analytical method development, or preclinical studies, which could significantly delay our ability to receive regulatory approval for our drug candidate. Additionally, changes in the analytical specifications required by the FDA or other regulatory authority, such as United States Pharmacopeial Convention standards, from time to time, could delay our ability to receive regulatory approval for our drug candidate. Switching or engaging **multiple third-party contractors** to produce our drug substance or drug product may be difficult and time consuming because the number of potential **manufacturers** may be limited and the process by

> which **multiple manufacturers** make the drug substance or drug product must meet established specifications at each manufacturing facility. It may be difficult and time consuming for us to find and engage replacement or **multiple manufacturers** quickly and on terms acceptable to us, if at all. For [Auryxia], the loss of **any of our** drug substance or **drug product manufacturers** would result in significant additional costs and delays in our development program. Moreover, if we need to add or change **manufacturers** after commercialization, the FDA and corresponding foreign regulatory agencies must approve any new **manufacturers** in advance, which will involve testing and additional inspections to ensure compliance with FDA and foreign regulations and standards.[29]

52. These statements were false and misleading when made because: (1) Keryx misrepresented that it relied on manufacturers/third-party contractors—plural—to manufacture Auryxia when, in fact, it relied on a single contract manufacturer; (2) this statement was materially misleading as it conveyed that Keryx relied on more than one third party manufacturer to convert its API into Auryxia when it only contracted with one such manufacturer; and (3) it omitted from disclosure the material fact that Keryx only contracted with one manufacturer to convert its API into Auryxia, which was necessary to make the statements made by Keryx not materially misleading.

***The June 12, 2014 False and Misleading Statements***

53. On June 12, 2014, Defendant Madison presented on Keryx's behalf to attendees at the 35th Annual Goldman Sachs Global Healthcare Conference. During that presentation, Madison made false and misleading statements. Specifically, Madison was asked by Goldman Sachs' Specialty and Big Pharma analyst Gary Nachman, regarding the manufacture of Auryxia, if the **facility** where it was being manufactured had been approved by the FDA. In response, he stated "The manufacturing **sites** and things like that have all been inspected and approved."[30] Madison's

---

[29] Form 10-Q, filed with the SEC on May 8, 2014, at 25-26. Section heading emphasis in original.

[30] Keryx Biopharmaceuticals' Management Presents at 35th Annual Goldman Sachs Global Healthcare Conference, June 12, 2014 (transcript) p. 9 of 15, available at http://seekingalpha.com/article/2266553-keryx-biopharmaceuticals-management-presents-at-35th-annual-goldman-sachs-global-healthcare-conference-transcript?all=true&find=keryx (GARY NACHMAN – Goldman Sachs "You are not disclosing more about the manufacturing, but the facility

response was false and materially misleading. By referencing "sites" Madison clearly conveyed that Keryx had more than one site where Auryxia was manufactured when, in fact, it did not.

***The August 7, 2014 False and Misleading Statements***

54. The August 7, 2014 Form 10-Q, signed by Defendant Oliviero, contained the following false and misleading statements in a subpart to *Item 1A Risk* Factors.

> ***We rely on third parties to manufacture and analytically test our drug candidate. If these third parties do not successfully manufacture and test our drug candidate, our business will be harmed.***
>
> We have limited experience in manufacturing products for clinical or commercial purposes. We intend to continue, in whole or in part, to use third **parties** to manufacture and analytically test our drug candidate for use in clinical trials and for future sales. We may not be able to enter into future contract agreements with these **third-parties** on terms acceptable to us, if at all.
>
> Our ability to conduct clinical trials, manufacture and commercialize our drug candidate will depend on the ability of such third **parties** to manufacture our drug candidate on a large scale at a competitive cost and in accordance with current Good Manufacturing Practices, or cGMP, and other regulatory requirements, including requirements from federal, state and local environmental and safety regulatory agencies and foreign regulatory requirements, if applicable. Prior to approval, the FDA must review and approve our validation studies for drug substance and drug product. Significant scale-up of manufacturing may result in unanticipated technical challenges and may require additional validation studies that the FDA must review and approve. **Contract manufacturers** often encounter difficulties in scaling up production, including problems involving raw material supplies, production yields, technical difficulties, scaled-up product characteristics, quality control and assurance, shortage of qualified personnel, capacity constraints, changing priorities within the **contract manufacturers**, compliance with FDA and foreign regulations, environmental compliance, production costs and development of advanced manufacturing techniques and process controls. Any of these difficulties, if they occur, and are not overcome to the satisfaction of the FDA or other regulatory agency, could lead to significant delays and possibly the termination of the development program for our drug candidate, particularly given that some of the third **parties** we employ in the manufacturing process are single source providers. These risks become more acute as we scale up for commercial quantities, where a reliable source of raw material supplies and drug substance and drug product processes become critical to commercial success. For example, given the large quantity of materials required for [Auryxia] production and the large

---

wherever it is being manufactured. Has that been approved by [the] FDA? GREG MADISON "Yes. The manufacturing sites and things like that have all been inspected and approved.").

quantities of [Auryxia] that will be required for commercial success, the commercial viability of [Auryxia], if approved, will also depend on adequate supply of starting materials that meet quality, quantity and cost standards and the ability of **our contract manufacturers** to produce drug substance and drug product in large scale. Failure to achieve this level of supply can jeopardize and prevent the successful commercialization of the product. Moreover, issues that may arise in our current transition to commercial batch sizes with **our third party manufacturers** of [Auryxia] can lead to significant delays in our development timelines.

**Our third-party manufacturers** may not perform as agreed or may not remain in the contract manufacturing business for the time required by us to successfully produce and market our drug candidate. In addition, **our contract manufacturers** will be subject to ongoing periodic and unannounced inspections by the FDA and corresponding foreign governmental agencies to ensure strict compliance with cGMP, as well as other governmental regulations and corresponding foreign standards. While we periodically audit **our contractors** for adherence to regulatory requirements, and are ultimately held responsible for their regulatory compliance, we cannot assure you that unforeseen changes at these **contractors** will not occur that could change their regulatory standing. The same issues apply to contract analytical services which we use for quality, impurity and release testing of our drug candidate. We are required by law to have adequate control over raw materials, components and finished products furnished by **our third-party manufacturers**, which we establish by contract and through periodic oversight, but unforeseen circumstances could affect **our third-party manufacturers'** compliance with applicable regulations and standards. As we continue to scale up production, we continue to develop analytical tools for ferric citrate drug substance and drug product testing. Failure to develop effective analytical tools could result in regulatory or technical delay or could jeopardize our ability to obtain FDA approval. Moreover, even with effective analytical methods available, there is no assurance that we will be able to analyze all the raw materials and qualify all impurities to the satisfaction of the FDA, possibly requiring additional analytical studies, analytical method development, or preclinical studies, which could significantly delay our ability to receive regulatory approval for our drug candidate. Additionally, changes in the analytical specifications required by the FDA or other regulatory authority, such as United States Pharmacopeial Convention standards, from time to time, could delay our ability to receive regulatory approval for our drug candidate. Switching or engaging **multiple third-party contractors** to produce our drug substance or drug product may be difficult and time consuming because the number of potential **manufacturers** may be limited and the process by which **multiple manufacturers** make the drug substance or drug product must meet established specifications at **each manufacturing facility**. It may be difficult and time consuming for us to find and engage replacement or **multiple manufacturers** quickly and on terms acceptable to us, if at all. For [Auryxia], the loss of **any of our** drug substance or **drug product manufacturers** would result in significant additional costs and delays in our development program. Moreover, if we need to add or change **manufacturers** after commercialization, the FDA and corresponding foreign regulatory agencies must approve any new **manufacturers**

> in advance, which will involve testing and additional inspections to ensure compliance with FDA and foreign regulations and standards.[31]

55. These statements were false and misleading when made because: (1) Keryx misrepresented that it relied on manufacturers/third-party contractors—plural—to manufacture Auryxia when, in fact, it relied on a single contract manufacturer; (2) this statement was materially misleading as it conveyed that Keryx relied on more than one third party manufacturer to convert its API into Auryxia when it only contracted with one such manufacturer; and (3) it omitted from disclosure the material fact that Keryx only contracted with one manufacturer to convert its API into Auryxia, which was necessary to make the statements made by Keryx not materially misleading.

***The November 6, 2014 False and Misleading Statements***

56. The November 6, 2014, Form 10-Q, signed by Defendant Oliviero, contained the following false and misleading statements in a subpart to *Item 1A Risk* Factors.

> ***We rely on third <u>parties</u> to manufacture and analytically test our drug. If these third <u>parties</u> do not successfully manufacture and test our drug, our business will be harmed.***
>
> We have limited experience in manufacturing products for clinical or commercial purposes. We intend to continue, in whole or in part, to use third **<u>parties</u>** to manufacture and analytically test our drug for use in clinical trials and for future commercial distribution. We may not be able to enter into future contract agreements with these **<u>third-parties</u>** on terms acceptable to us, if at all.
>
> Our ability to conduct clinical trials, manufacture and commercialize our drug will depend on the ability of such third **<u>parties</u>** to manufacture our drug on a large scale at a competitive cost and in accordance with current Good Manufacturing Practice regulations, ("cGMPs"), and other regulatory requirements, including requirements from federal, state and local environmental and safety regulatory agencies and foreign regulatory requirements, if applicable. Significant scale-up of manufacturing may result in unanticipated technical challenges and will require validation studies that are subject to FDA inspection. Scale-up/technology transfer activities can be complex, and insufficient process knowledge can result in a poorly scaled up process with inadequate process control. A lack of process control can lead to increased deviations during the manufacturing process, out of specification

[31] Form 10-Q, filed with the SEC on August 7, 2014, at 25. Section heading emphasis in original.

test results, batch rejection and the possible distribution of drug products that do not conform to predetermined specifications. In addition, a variety of factors can affect a contract manufacturer's qualifications to produce acceptable product, including deficiencies in the contractor's quality unit, lack of training, a shortage of qualified personnel, capacity constraints and changes in the contractor's commercial or quality related priorities. Any of these difficulties, if they occur, and are not overcome to the satisfaction of the FDA or other regulatory agency, could lead to significant delays and possibly the termination of the development program for our drug, particularly given that some of the third **parties** we intend to employ in the manufacturing process are single source providers. These risks become more acute as we scale up for commercial quantities, where a reliable source of active pharmaceutical ingredient ("API") and a qualified contract manufacturer become critical to commercial success. For example, given the large quantity of materials required for [Auryxia] production and the large quantities of [Auryxia] that will be required for commercial success, the commercial viability of [Auryxia] will also depend on adequate supply of starting materials that meet quality, quantity and cost standards and the ability of **our contract manufacturers** to produce the API and finished drug product on a commercial scale. Failure to achieve this level of supply can jeopardize and prevent the successful commercialization of the product. Moreover, issues that may arise in our scale-up/technology transfer of [Auryxia] can lead to significant delays in our development and commercial timelines.

**Our third-party manufacturers** may not perform as required under the terms of our supply agreement or quality agreement, or may not remain in the contract manufacturing business for the time required by us to successfully manufacture and distribute our drug. In addition, **our contract manufacturers** will be subject to ongoing periodic and unannounced inspections by the FDA and corresponding foreign governmental agencies to ensure strict compliance with cGMPs, as well as other governmental regulations and corresponding foreign standards. While we periodically audit **our contractors** for adherence to regulatory requirements, and are ultimately held responsible for their regulatory compliance, we cannot assure you that unforeseen changes at these **contractors** will not occur that could change their regulatory standing. The same issues apply to contract analytical services which we use for quality, impurity and release testing of our drug. We are required by law to establish adequate oversight and control over raw materials, components and finished products furnished by **our third-party manufacturers**, which we establish by contract, supplier qualification and periodic audits, but unforeseen circumstances could affect **our third-party manufacturers'** compliance with applicable regulations and standards. As we continue to scale up production, we continue to develop analytical tools for [Auryxia] drug substance and drug product testing. Failure to develop effective analytical tools could result in regulatory or technical delay or could jeopardize our ability to obtain FDA approval. Moreover, even with effective analytical methods available, there is no assurance that we will be able to analyze all the raw materials and qualify all impurities to the satisfaction of the FDA, possibly requiring additional analytical studies, analytical method development, or preclinical studies, which could significantly delay our ability to receive regulatory approvals for our drug. Additionally, changes in the analytical

> specifications required by the FDA or other regulatory authority, such as United States Pharmacopeial Convention standards, from time to time, could delay our ability to receive regulatory approvals for our drug or our commercial efforts. Switching or engaging **multiple third-party contractors** to produce our drug substance or drug product may be difficult and time consuming because the number of potential **manufacturers** may be limited and the process by which multiple **manufacturers** make the drug substance or drug product must meet established specifications at each manufacturing facility. It may be difficult and time consuming for us to find and engage replacement or **multiple manufacturers** quickly and on terms acceptable to us, if at all. For [Auryxia], the loss of any of our drug substance or drug product **manufacturers** would result in significant additional costs and delays in our development program. Moreover, if we need to add or change **manufacturers** after commercialization, the FDA and corresponding foreign regulatory agencies must approve any new **manufacturers** in advance, which will involve additional inspections to ensure compliance with FDA and foreign regulations and standards.[32]

57. These statements were false and misleading when made because: (1) Keryx misrepresented that it relied on manufacturers/third-party contractors—plural—to manufacture Auryxia when, in fact, it relied on a single contract manufacturer; (2) this statement was materially misleading as it conveyed that Keryx relied on more than one third party manufacturer to convert its API into Auryxia when it only contracted with one such manufacturer; and (3) it omitted from disclosure the material fact that Keryx only contracted with one manufacturer to convert its API into Auryxia, which was necessary to make the statements made by Keryx not materially misleading.

***The January 20, 2015 False and Misleading Statements***

58. On January 20, 2015, Keryx filed with the SEC a false and materially misleading Prospectus Supplement to the Company's Prospectus dated January 20, 2015. The Prospectus Supplement contained the following false and misleading statements.

> ***We rely on third parties to manufacture and analytically test our drug. If these third parties do not successfully manufacture and test our drug, our business will be harmed.***

[32] Form 10-Q, filed with the SEC on November 6, 2014, at 25. Section heading emphasis in original.

We have limited experience in manufacturing products for clinical or commercial purposes. We intend to continue, in whole or in part, to use third **parties** to manufacture and analytically test our drug for use in clinical trials and for future commercial distribution. We may not be able to enter into future contract agreements with these **third-parties** on terms acceptable to us, if at all.

Our ability to conduct clinical trials, manufacture and commercialize our drug will depend on the ability of such third **parties** to manufacture our drug on a large scale at a competitive cost and in accordance with current Good Manufacturing Practice regulations, or cGMPs, and other regulatory requirements, including requirements from federal, state and local environmental and safety regulatory agencies and foreign regulatory requirements, if applicable. Significant scale-up of manufacturing may result in unanticipated technical challenges and will require validation studies that are subject to FDA inspection. Scale-up/technology transfer activities can be complex, and insufficient process knowledge can result in a poorly scaled up process with inadequate process control. A lack of process control can lead to increased deviations during the manufacturing process, out of specification test results, batch rejection and the possible distribution of drug products that do not conform to predetermined specifications. In addition, a variety of factors can affect a contract manufacturer's qualifications to produce acceptable product, including deficiencies in the contractor's quality unit, lack of training, a shortage of qualified personnel, capacity constraints and changes in the contractor's commercial or quality related priorities. Any of these difficulties, if they occur, and are not overcome to the satisfaction of the FDA or other regulatory agency, could lead to significant delays and possibly the termination of the development program for our drug, particularly given that some of the third **parties** we intend to employ in the manufacturing process are single source providers. These risks become more acute as we scale up for commercial quantities, where a reliable source of active pharmaceutical ingredient, or API, and a qualified contract manufacturer become critical to commercial success. For example, given the large quantity of materials required for Auryxia production and the large quantities of Auryxia that will be required for commercial success, the commercial viability of Auryxia will also depend on adequate supply of starting materials that meet quality, quantity and cost standards and the ability of **our contract manufacturers** to produce the API and finished drug product on a commercial scale. Failure to achieve this level of supply can jeopardize and prevent the successful commercialization of the product. Moreover, issues that may arise in our scale-up/technology transfer of Auryxia can lead to significant delays in our development and commercial timelines.

**Our third-party manufacturers** may not perform as required under the terms of our supply agreement or quality agreement, or may not remain in the contract manufacturing business for the time required by us to successfully manufacture and distribute our drug. In addition, **our contract manufacturers** will be subject to ongoing periodic and unannounced inspections by the FDA and corresponding foreign governmental agencies to ensure strict compliance with cGMPs, as well as other governmental regulations and corresponding foreign standards. While we periodically audit **our contractors** for adherence to regulatory requirements, and are ultimately held responsible for their regulatory compliance, we cannot assure

> you that unforeseen changes at these **contractors** will not occur that could change their regulatory standing. The same issues apply to contract analytical services which we use for quality, impurity and release testing of our drug. We are required by law to establish adequate oversight and control over raw materials, components and finished products furnished by **our third-party manufacturers**, which we establish by contract, supplier qualification and periodic audits, but unforeseen circumstances could affect **our third-party manufacturers'** compliance with applicable regulations and standards. As we continue to scale up production, we continue to develop analytical tools for Auryxia drug substance and drug product testing. Failure to develop effective analytical tools could result in regulatory or technical delay or could jeopardize our ability to obtain FDA approval. Moreover, even with effective analytical methods available, there is no assurance that we will be able to analyze all the raw materials and qualify all impurities to the satisfaction of the FDA, possibly requiring additional analytical studies, analytical method development, or preclinical studies, which could significantly delay our ability to receive regulatory approvals for our drug. Additionally, changes in the analytical specifications required by the FDA or other regulatory authority, such as United States Pharmacopeial Convention standards, from time to time, could delay our ability to receive regulatory approvals for our drug or our commercial efforts. Switching or engaging multiple **third-party contractors** to produce our drug substance or drug product may be difficult and time consuming because the number of potential **manufacturers** may be limited and the process by which multiple **manufacturers** make the drug substance or drug product must meet established specifications at **each manufacturing facility**. It may be difficult and time consuming for us to find and engage replacement or **multiple manufacturers** quickly and on terms acceptable to us, if at all. For Auryxia, the loss of **any of our** drug substance or **drug product manufacturers** would result in significant additional costs and delays in our development program. Moreover, if we need to add or change **manufacturers** after commercialization, the FDA and corresponding foreign regulatory agencies must approve any new **manufacturers** in advance, which will involve additional inspections to ensure compliance with FDA and foreign regulations and standards.[33]

59. Keryx's statements in the January 20, 2015 Prospectus Supplement were repeated verbatim in the final January 22, 2015 Prospectus Supplement on pages S-8–S-9. The January 20 and 22, 2015 statements were false and misleading when made because: (1) Keryx misrepresented that it relied on manufacturers/third-party contractors—plural—to manufacture Auryxia when, in fact, it relied on a single contract manufacturer; (2) this statement was materially misleading as it conveyed that Keryx relied on more than one third party manufacturer to convert its API into

[33] Form 424B5, filed with the SEC on January 20, 2015, at S-8–S-9. Section heading emphasis in original.

Auryxia when it only contracted with one such manufacturer; and (3) it omitted from disclosure the material fact that Keryx only contracted with one manufacturer to convert its API into Auryxia, which was necessary to make the statements made by Keryx not materially misleading.

***The February 27, 2015 False and Misleading Statements***

60. On February 27, 2015, Keryx filed with the SEC a materially misleading Form 10-K (the "2014 Form 10-K). The 2014 Form 10-K was signed by Defendants Bentsur and Oliviero and contained the following false and misleading statements on pages 17-19 and 24-25:

> **SUPPLY AND MANUFACTURING**
>
> We have limited experience in manufacturing products for clinical or commercial purposes. We intend to continue, in whole or in part, to use **third parties** to manufacture and analytically test our drug, Auryxia, for use in clinical trials and for sales.
>
> We believe that we have established **contract manufacturing relationships** for the supply of Auryxia to ensure that we will have sufficient material for clinical trials and the ongoing commercial launch. In addition, we are establishing the basis for long-term commercial production capabilities to supply the potential expanded demand for Auryxia in future years. As with any supply program, obtaining raw materials of the required quality and quantity cannot be guaranteed and we cannot ensure that we will be successful in this endeavor.
>
> As we continue to build inventory for the expanded commercialization of Auryxia, we intend to engage **additional suppliers** to produce Auryxia under current Good Manufacturing Practice, or cGMP, regulations. **Our third-party manufacturers** have a limited number of facilities in which Auryxia can be produced and will have limited experience in manufacturing Auryxia in quantities sufficient for commercialization. **Our third-party manufacturers** will have other clients and may have other priorities that could affect their ability to perform the work satisfactorily and/or on a timely basis. Both of these occurrences would be beyond our control.
>
> We expect to similarly rely on **contract manufacturing relationships** for any products that we may in-license or acquire in the future. However, there can be no assurance that we will be able to successfully contract with such **manufacturers** on terms acceptable to us, or at all.
>
> **Contract manufacturers** are subject to ongoing periodic and unannounced inspections by the FDA, the Drug Enforcement Administration and corresponding state and foreign government agencies to ensure strict compliance with cGMP and other state and federal regulations and corresponding foreign standards. Any of our contractors in Europe face similar challenges from the numerous European Union

and member state regulatory agencies and authorized bodies. We do not have control over **third-party manufacturers'** compliance with these regulations and standards, other than through contractual obligations and periodic auditing. If they are deemed out of compliance with cGMPs, approvals could be delayed, product recalls could result, inventory could be destroyed, production could be stopped and supplies could be delayed or otherwise disrupted.

If we need to change **manufacturers** after commercialization, the FDA and corresponding foreign regulatory agencies must approve these new **manufacturers** in advance, which will involve testing and additional inspections to ensure compliance with FDA regulations and standards and may require significant lead times and delay, and disruption of supply. Furthermore, switching **manufacturers** may be difficult because the number of potential **manufacturers** is limited. It may be difficult or impossible for us to find a replacement manufacturer quickly or on terms acceptable to us, or at all.

* * *

***We rely on third parties to manufacture and analytically test our drug. If these third parties do not successfully manufacture and test our drug, our business will be harmed.***

We have limited experience in manufacturing products for clinical or commercial purposes. We intend to continue, in whole or in part, to use **third parties** to manufacture and analytically test our drug for use in clinical trials and for future commercial distribution. We may not be able to enter into future contract agreements with these third-parties on terms acceptable to us, if at all.

Our ability to conduct clinical trials, manufacture and commercialize our drug will depend on the ability of such **third parties** to manufacture our drug on a large scale at a competitive cost and in accordance with current Good Manufacturing Practice regulations, (or cGMPs), and other regulatory requirements, including requirements from federal, state and local environmental and safety regulatory agencies and foreign regulatory requirements, if applicable. Significant scale-up of manufacturing may result in unanticipated technical challenges and will require validation studies that are subject to FDA inspection. Scale-up/technology transfer activities can be complex, and insufficient process knowledge can result in a poorly scaled up process with inadequate process control. A lack of process control can lead to increased deviations during the manufacturing process, out of specification test results, batch rejection and the possible distribution of drug products that do not conform to predetermined specifications. In addition, a variety of factors can affect a contract manufacturer's qualifications to produce acceptable product, including deficiencies in the contractor's quality unit, lack of training, a shortage of qualified personnel, capacity constraints and changes in the contractor's commercial or quality related priorities. Any of these difficulties, if they occur, and are not overcome to the satisfaction of the FDA or other regulatory agency, could lead to significant delays and possibly the termination of the development program for our drug, particularly given that some of the **third parties** we intend to employ in the manufacturing process are single source providers. These risks become more

acute as we scale up for commercial quantities, where a reliable source of active pharmaceutical ingredient (or API) and a qualified contract manufacturer become critical to commercial success. For example, given the large quantity of materials required for Auryxia production and the large quantities of Auryxia that will be required for commercial success, the commercial viability of Auryxia will also depend on adequate supply of starting materials that meet quality, quantity and cost standards and the ability of **our contract manufacturers** to produce the API and finished drug product on a commercial scale. Failure to achieve this level of supply can jeopardize and prevent the successful commercialization of the product. Moreover, issues that may arise in our scale-up/technology transfer of Auryxia can lead to significant delays in our development and commercial timelines.

**Our third-party manufacturers** may not perform as required under the terms of our supply agreement or quality agreement, or may not remain in the contract manufacturing business for the time required by us to successfully manufacture and distribute our drug. In addition, **our contract manufacturers** will be subject to ongoing periodic and unannounced inspections by the FDA and corresponding foreign governmental agencies to ensure strict compliance with cGMPs, as well as other governmental regulations and corresponding foreign standards. While we periodically audit **our contractors** for adherence to regulatory requirements, and are ultimately held responsible for their regulatory compliance, we cannot assure you that unforeseen changes at **these contractors** will not occur that could change their regulatory standing. The same issues apply to contract analytical services which we use for quality, impurity and release testing of our drug. We are required by law to establish adequate oversight and control over raw materials, components and finished products furnished by **our third-party manufacturers**, which we establish by contract, supplier qualification and periodic audits, but unforeseen circumstances could affect **our third-party manufacturers'** compliance with applicable regulations and standards. As we continue to scale up production, we continue to develop analytical tools for Auryxia drug substance and drug product testing. Failure to develop effective analytical tools could result in regulatory or technical delay or could jeopardize our ability to obtain FDA approval. Moreover, even with effective analytical methods available, there is no assurance that we will be able to analyze all the raw materials and qualify all impurities to the satisfaction of the FDA, possibly requiring additional analytical studies, analytical method development, or preclinical studies, which could significantly delay our ability to receive regulatory approvals for our drug. Additionally, changes in the analytical specifications required by the FDA or other regulatory authority, such as United States Pharmacopeial Convention standards, from time to time, could delay our ability to receive regulatory approvals for our drug or our commercial efforts. Switching or engaging multiple third-party contractors to produce our drug substance or drug product may be difficult and time consuming because the number of potential **manufacturers** may be limited and the process by which **multiple manufacturers** make the drug substance or drug product must meet established specifications at **each manufacturing facility**. It may be difficult and time consuming for us to find and engage replacement or **multiple manufacturers** quickly and on terms acceptable to us, if at all. For Auryxia, the loss of any of **our**

> drug substance or **<u>drug product manufacturers</u>** would result in significant additional costs and delays in our development program. Moreover, if we need to add or change **<u>manufacturers</u>** after commercialization, the FDA and corresponding foreign regulatory agencies must approve any new **<u>manufacturers</u>** in advance, which will involve additional inspections to ensure compliance with FDA and foreign regulations and standards.

61. These statements were false and misleading when made because: (1) Keryx misrepresented that it relied on manufacturers/third-party contractors—plural—to manufacture Auryxia when, in fact, it relied on a single contract manufacturer; (2) this statement was materially misleading as it conveyed that Keryx relied on more than one third party manufacturer to convert its API into Auryxia when it only contracted with one such manufacturer; and (3) it omitted from disclosure the material fact that Keryx only contracted with one manufacturer to convert its API into Auryxia, which was necessary to make the statements made by Keryx not materially misleading.

***The May 4, 2015 False and Misleading Statements***

62. The May 4, 2015, Form 10-Q, signed by Defendant Oliviero, contained the following false and misleading statements in a subpart to *Item 1A Risk Factors*.

> ***We rely on third <u>parties</u> to manufacture and analytically test our drug. If these third <u>parties</u> do not successfully manufacture and test our drug, our business will be harmed.***
>
> We have limited experience in manufacturing products for clinical or commercial purposes. We intend to continue, in whole or in part, to use third **<u>parties</u>** to manufacture and analytically test our drug for commercial distribution and use in clinical trials and. We may not be able to enter into future contract agreements with these **<u>third-parties</u>** on terms acceptable to us, if at all.
>
> Our ability to conduct clinical trials, manufacture and commercialize our drug will depend on the ability of such third **<u>parties</u>** to manufacture our drug on a large scale at a competitive cost and in accordance with current Good Manufacturing Practice regulations, (or cGMPs), and other regulatory requirements, including requirements from federal, state and local environmental and safety regulatory agencies and foreign regulatory requirements, if applicable. Significant scale-up of manufacturing may result in unanticipated technical challenges and will require validation studies that are subject to FDA inspection. Scale-up/technology transfer activities can be complex, and insufficient process knowledge can result in a poorly

scaled up process with inadequate process control. A lack of process control can lead to increased deviations during the manufacturing process, out of specification test results, batch rejection and the possible distribution of drug products that do not conform to predetermined specifications. In addition, a variety of factors can affect a contract manufacturer's qualifications to produce acceptable product, including deficiencies in the contractor's quality unit, lack of training, a shortage of qualified personnel, capacity constraints and changes in the contractor's commercial or quality related priorities. Any of these difficulties, if they occur, and are not overcome to the satisfaction of the FDA or other regulatory agency, could lead to significant delays and possibly the termination of the development program for our drug, particularly given that some of the third **parties** we intend to employ in the manufacturing process are single source providers. These risks become more acute as we scale up for commercial quantities, where a reliable source of active pharmaceutical ingredient (or API) and a qualified contract manufacturer become critical to commercial success. For example, given the large quantity of materials required for Auryxia production and the large quantities of Auryxia that will be required for commercial success, the commercial viability of Auryxia will also depend on adequate supply of starting materials that meet quality, quantity and cost standards and the ability of **our contract manufacturers** to produce the API and finished drug product on a commercial scale. Failure to achieve this level of supply can jeopardize and prevent the successful commercialization of the product. Moreover, issues that may arise in our scale-up/technology transfer of Auryxia can lead to significant delays in our development and commercial timelines.

**Our third-party manufacturers** may not perform as required under the terms of our supply agreement or quality agreement, or may not remain in the contract manufacturing business for the time required by us to successfully manufacture and distribute our drug. In addition, **our contract manufacturers** will be subject to ongoing periodic and unannounced inspections by the FDA and corresponding foreign governmental agencies to ensure strict compliance with cGMPs, as well as other governmental regulations and corresponding foreign standards. While we periodically audit **our contractors** for adherence to regulatory requirements, and are ultimately held responsible for their regulatory compliance, we cannot assure you that unforeseen changes at these **contractors** will not occur that could change their regulatory standing. The same issues apply to contract analytical services which we use for quality, impurity and release testing of our drug. We are required by law to establish adequate oversight and control over raw materials, components and finished products furnished by **our third-party manufacturers**, which we establish by contract, supplier qualification and periodic audits, but unforeseen circumstances could affect **our third-party manufacturers'** compliance with applicable regulations and standards. As we continue to scale up production, we continue to develop analytical tools for Auryxia drug substance and drug product testing. Failure to develop effective analytical tools could result in regulatory or technical delay or could jeopardize our ability to obtain FDA approval. Moreover, even with effective analytical methods available, there is no assurance that we will be able to analyze all the raw materials and qualify all impurities to the satisfaction of the FDA, possibly requiring additional analytical studies, analytical method

> development, or preclinical studies, which could significantly delay our ability to receive regulatory approvals for our drug. Additionally, changes in the analytical specifications required by the FDA or other regulatory authority, such as United States Pharmacopeial Convention standards, from time to time, could delay our ability to receive regulatory approvals for our drug or our commercial efforts. Switching or engaging **multiple third-party contractors** to produce our drug substance or drug product may be difficult and time consuming because the number of potential **manufacturers** may be limited and the process by which **multiple manufacturers** make the drug substance or drug product must meet established specifications at each manufacturing facility. It may be difficult and time consuming for us to find and engage replacement or **multiple manufacturers** quickly and on terms acceptable to us, if at all. For Auryxia, the loss of **any of our** drug substance or **drug product manufacturers** would result in significant additional costs and delays in our development program. Moreover, if we need to add or change **manufacturers** after commercialization, the FDA and corresponding foreign regulatory agencies must approve any new **manufacturers** in advance, which will involve additional inspections to ensure compliance with FDA and foreign regulations and standards.[34]

63. These statements were false and misleading when made because: (1) Keryx misrepresented that it relied on manufacturers/third party contractors—plural—to manufacture Auryxia when, in fact, it relied on a single contract manufacturer; (2) this statement was materially misleading as it conveyed that Keryx relied on more than one third party manufacturer to convert its API into Auryxia when it only contracted with one such manufacturer; and (3) it omitted from disclosure the material fact that Keryx only contracted with one manufacturer to convert its API into Auryxia, which was necessary to make the statements made by Keryx not materially misleading.

***The August 6, 2015 False and Misleading Statements***

64. The August 6, 2015, Form 10-Q, signed by Defendant Holmes, contained, in a subpart to *Item 1A Risk Factors*, on pages 30-31, a disclosure identical to the one set forth in paragraph 62 above. These statements were false and misleading when made because: (1) Keryx misrepresented that it relied on third parties—plural—to manufacture Auryxia when, in fact, it

[34] Form 10-Q, filed with the SEC on May 4, 2015, at 27-28. Section heading emphasis in original.

relied on a single contract manufacturer; (2) this statement was materially misleading as it conveyed that Keryx relied on more than one third party manufacturer to convert its API into Auryxia when it only contracted with one such manufacturer; and (3) it omitted from disclosure the material fact that Keryx only contracted with one manufacturer to convert its API into Auryxia, which was necessary to make the statements made by Keryx not materially misleading.

***The October 29, 2015 False and Misleading Statements***

65. The October 29, 2015, Form 10-Q, signed by Defendant Holmes, contained, in a subpart to *Item 1A Risk Factors* on pages 32-33, a disclosure identical to the one set forth in paragraph 62 above. These statements were false and misleading when made because: (1) Keryx misrepresented that it relied on third parties—plural—to manufacture Auryxia when, in fact, it relied on a single contract manufacturer; (2) this statement was materially misleading as it conveyed that Keryx relied on more than one third party manufacturer to convert its API into Auryxia when it only contracted with one such manufacturer; and (3) it omitted from disclosure the material fact that Keryx only contracted with one manufacturer to convert its API into Auryxia, which was necessary to make the statements made by Keryx not materially misleading.

***The February 25, 2016 Fourth Quarter and Year-End Press Release***

66. On February 25, 2016, the Company issued a press release entitled *Keryx Biopharmaceuticals Announces Fourth Quarter and Year-End 2015 Financial Results*. This press release is provided for context and nothing in this release is alleged to be materially false and/or misleading at the time it was issued.

67. Specifically, the press release stated, in relevant part:

> "As we enter 2016, the fundamentals of Auryxia are solid, and we plan to build on that foundation to advance our launch in the U.S.," said Greg Madison, chief executive officer of Keryx. "Importantly, the data readout expected in early second quarter from the ferric citrate phase 3 label expansion trial will be an important

> marker of our efforts to help people with pre-dialysis chronic kidney disease. Specifically, we believe that ferric citrate – which, through its novel mechanism of action, delivers iron orally through the body's natural absorption process – could be the first FDA-approved oral medicine to treat iron deficiency anemia (IDA) in this patient population."
>
> * * *
>
> **2016 Financial Guidance**
>
> This section contains forward-looking guidance about the financial outlook for Keryx Biopharmaceuticals
>
> Auryxia net U.S. product sales: Keryx **expects full year 2016 Auryxia net U.S. product sales to be in the range of $31 to $34 million**. **The company expects sales to ramp throughout the year**, as it realizes the full impact of its expanded sales force.
>
> Cash operating expenses: Keryx reiterated its cash operating expenses in 2016 will be in the range of $87 million to $92 million. Cash operating expense guidance excludes cost of goods sold, license expenses, and other non-cash expenses.

68. The Company also conducted a conference call with investors and analysts on February 25, 2016. During this call, Defendant Holmes stated:

> We are encouraged with the solid fundamentals we see with Auryxia, given the continued growth in prescriptions and the experience we gained in 2015, coupled with our market research and expanded sales force, we believe it is an appropriate time to provide sales guidance. As you saw in today's press release, we expect full year 2016 Auryxia net US product sales to be in the range of $31 million to $34 million. We exited 2015 with a 1.4% share of the phosphate binder market, and this guidance range would give us 2016 exit share approaching 3%.[35]

[35] Keryx Biopharmaceuticals' (KERX) CEO Greg Madison on Q4 2015 Results - Earnings Call Transcript, available at http://seekingalpha.com/article/3930926-keryx-biopharmaceuticals-kerx-ceo-greg-madison-q4-2015-results-earnings-call-transcript?all=true&find=keryx, at 7.

***The February 26, 2016 False and Misleading Statements***

69. On February 26, 2016, Keryx filed with the SEC a materially misleading Form 10-K. The annual filing was signed by Defendants Holmes and Madison. In the subpart entitled **Supply and Manufacturing**, setting forth the Company's disclosures regarding its drug supply and manufacturing risks, contained the following false and misleading statements.

> **SUPPLY AND MANUFACTURING**
>
> We have limited experience in manufacturing products for clinical or commercial purposes. We intend to continue, in whole or in part, to use third **parties** to manufacture and analytically test our drug, Auryxia, for use in clinical trials and for sales.
>
> We believe that we have established **contract manufacturing relationships** for the supply of Auryxia to ensure that we will have sufficient material for clinical trials and ongoing commercial sales. In addition, **we are establishing the basis for long-term commercial production capabilities to supply the potential expanded demand for Auryxia in future years**. As with any supply program, obtaining raw materials of the required quality and quantity cannot be guaranteed and we cannot ensure that we will be successful in this endeavor.
>
> As we continue to build inventory for the expanded commercialization of Auryxia, we intend to engage additional suppliers to produce Auryxia under current Good Manufacturing Practice, or cGMP, requirements. **Our third-party manufacturers** have a limited number of **facilities** in which Auryxia can be produced and will have limited experience in manufacturing Auryxia in quantities sufficient for commercialization. **Our third-party manufacturers** will have other clients and may have other priorities that could affect their ability to perform the work satisfactorily and/or on a timely basis. Both of these occurrences would be beyond our control.
>
> We expect to similarly rely on **contract manufacturing relationships** for any products that we may in-license or acquire in the future. However, there can be no assurance that we will be able to successfully contract with such **manufacturers** on terms acceptable to us, or at all.
>
> **Contract manufacturers** are subject to ongoing periodic and unannounced inspections by the FDA, the Drug Enforcement Administration and corresponding

state and foreign government agencies to ensure strict compliance with cGMP and other state and federal requirements and corresponding foreign standards. Any of our contractors in Europe face similar challenges from the numerous European Union and member state regulatory agencies and authorized bodies. We do not have control over **third-party manufacturers'** compliance with these regulations and standards, other than through contractual obligations and periodic auditing. If they are deemed out of compliance with cGMPs, approvals could be delayed, product recalls could result, inventory could be destroyed, production could be stopped and supplies could be delayed or otherwise disrupted.

If we need to change **manufacturers** after commercialization, the FDA and corresponding foreign regulatory agencies must approve these new **manufacturers** in advance, which will involve testing and additional inspections to ensure compliance with applicable requirements and standards and may require significant lead times and delay, and disruption of supply. Furthermore, switching **manufacturers** may be difficult because the number of potential manufacturers is limited. It may be difficult or impossible for us to find a replacement manufacturer quickly or on terms acceptable to us, or at all.[36]

70. These statements were false and misleading when made because: (1) Keryx misrepresented that it relied on third-party manufacturers—plural—to manufacture Auryxia when, in fact, it relied on a single contract manufacturer; (2) this statement was materially misleading as it conveyed that Keryx relied on more than one third party manufacturer to convert its API into Auryxia when it only contracted with one such manufacturer; and (3) it omitted from disclosure the material fact that Keryx only contracted with one manufacturer to convert its API into Auryxia, which was necessary to make the statements made by Keryx not materially misleading.

71. The February 26, 2016 Form 10-K also contained, in a subpart to *Item 1A Risk Factors*, the following false and misleading statements

***We rely on third parties to manufacture and analytically test our drug. If these third parties do not successfully manufacture and test our drug, our business will be harmed.***

[36] Form 10-K, filed with the SEC on February 26, 2016, at 14-15. Section heading emphasis in original.

We have limited experience in manufacturing products for clinical or commercial purposes. We intend to continue, in whole or in part, to use third **parties** to manufacture and analytically test our drug for commercial distribution and use in clinical trials. We may not be able to enter into future contract agreements with these third-**parties** on terms acceptable to us, if at all.

Our ability to conduct clinical trials, manufacture and commercialize our drug will depend on the ability of such third **parties** to manufacture our drug on a large scale at a competitive cost and in accordance with current cGMPs and other regulatory requirements, including requirements from federal, state and local environmental and safety regulatory agencies and foreign regulatory requirements, if applicable. Significant scale-up of manufacturing may result in unanticipated technical challenges and will require validation studies that are subject to FDA inspection. Scale-up and technology transfer activities can be complex, and insufficient process knowledge can result in a poorly scaled up process with inadequate process control. A lack of process control can lead to increased deviations during the manufacturing process, out of specification test results, batch rejection and the possible distribution of drug products that do not conform to predetermined specifications. In addition, a variety of factors can affect a contract manufacturer's qualifications to produce acceptable product, including deficiencies in the contractor's quality unit, lack of training, a shortage of qualified personnel, capacity constraints and changes in the contractor's commercial or quality related priorities. Any of these difficulties, if they occur, and are not overcome to the satisfaction of the FDA or other regulatory agency, could lead to significant delays and possibly the termination of the development program for our drug, particularly given that some of the third **parties** we intend to employ in the manufacturing process are single source providers. These risks become more acute as we scale up for commercial quantities, where a reliable source of active pharmaceutical ingredient, or API, and a qualified contract manufacturer become critical to commercial success. For example, given the large quantity of materials required for Auryxia production and the large quantities of Auryxia that will be required for commercial success, the commercial viability of Auryxia will also depend on adequate supply of starting materials that meet quality, quantity and cost standards and the ability of **our contract manufacturers** to produce the API and finished drug product on a commercial scale. Failure to achieve this level of supply can jeopardize and prevent the successful commercialization of the product. Moreover, issues that may arise in our scale-up and technology transfer of Auryxia may lead to significant delays in our development and commercial timelines.

**Our third-party manufacturers** may not perform as required under the terms of our supply agreement or quality agreement, or may not remain in the contract

manufacturing business for the time required by us to successfully manufacture and distribute our drug. In addition, **our contract manufacturers** will be subject to ongoing periodic and unannounced inspections by the FDA and corresponding foreign governmental agencies to ensure strict compliance with cGMPs, as well as other governmental regulations and corresponding foreign standards. While we periodically audit **our contractors** for adherence to regulatory requirements, and are ultimately held responsible for their regulatory compliance, we cannot assure you that unforeseen changes at these **contractors** will not occur that could change their regulatory standing. The same issues apply to contract analytical services which we use for quality, impurity and release testing of our drug. We are required by law to establish adequate oversight and control over raw materials, components and finished products furnished by **our third-party manufacturers**, which we establish by contract, supplier qualification and periodic audits, but unforeseen circumstances could affect **our third-party manufacturers'** compliance with applicable regulations and standards. As we continue to scale up production, we continue to develop analytical tools for Auryxia drug substance and drug product testing. Failure to develop effective analytical tools could result in regulatory or technical delay or could jeopardize our ability to obtain FDA approval. Moreover, even with effective analytical methods available, there is no assurance that we will be able to analyze all the raw materials and qualify all impurities to the satisfaction of the FDA, possibly requiring additional analytical studies, analytical method development, or preclinical studies, which could significantly delay our ability to receive regulatory approvals for our drug. Additionally, changes in the analytical specifications required by the FDA or other regulatory authority, such as United States Pharmacopeial Convention standards, from time to time, could delay our ability to receive regulatory approvals for our drug or our commercial efforts. Switching or engaging **multiple third-party contractors** to produce our drug substance or drug product may be difficult and time consuming because the number of potential **manufacturers** may be limited and the process by which **multiple manufacturers** make the drug substance or drug product must meet established specifications at **each manufacturing facility**. It may be difficult and time consuming for us to find and engage replacement or **multiple manufacturers** quickly and on terms acceptable to us, if at all. For Auryxia, the loss of **any of our** drug substance or **drug product manufacturers** would result in significant additional costs and delays in our development program. Moreover, if we need to add or change **manufacturers** after commercialization, the FDA and corresponding foreign regulatory agencies must approve any new **manufacturers**

in advance, which will involve additional inspections to ensure compliance with FDA and foreign regulations and standards.[37]

72. These statements were false and misleading when made because: (1) Keryx misrepresented that it relied on third parties—plural—to manufacture Auryxia when, in fact, it relied on a single contract manufacturer; (2) this statement was materially misleading as it conveyed that Keryx relied on more than one third party manufacturer to convert its API into Auryxia when it only contracted with one such manufacturer; and (3) it omitted from disclosure the material fact that Keryx only contracted with one manufacturer to convert its API into Auryxia, which was necessary to make the statements made by Keryx not materially misleading.

***The April 1, 2016 False and Misleading Statements***

73. On April 1, 2016, Keryx filed with the SEC a Preliminary Schedule 14A (the "2016 Preliminary Proxy"). The 2016 Preliminary Proxy contained the following false and misleading statements and table.

> ***Annual Cash Incentive Awards***
>
> Under our annual incentive cash bonus program, corporate goals are proposed by management and approved by the Compensation Committee. The weight given to the various Company goals is based on the Compensation Committee's and the Board's subjective determination of the Company's relative strategic and operating priorities for the upcoming fiscal year. Whenever possible, the Compensation Committee attempts to develop quantitative measures of performance to provide clarity throughout the year as to how the Company is progressing against its goals.
>
> Our 2015 annual incentive awards (both cash and equity) were based, in large part, upon the achievement of corporate performance goals, which included a combination of commercial, operational, clinical and regulatory goals related to our products as well as other corporate goals, and were achieved at an aggregate level of 45%. The corporate performance goals and objectives used to determine annual incentive awards in 2015 were as follows:

[37] Form 10-K, filed with the SEC on February 26, 2016, at 26-27. Section heading emphasis in original.

| Goal(s) | Weight | 2015 Performance |
|---|---|---|
| Pre-determined U.S. Net Sales Goal for Auryxia | 20% | 0% |
| Pre-determined U.S. Market Share Goal for Auryxia in Q4 2015 | 15% | 0% |
| Achievement of Pre-determined Percentage of Medicare Part D Access | 20% | 50% |
| Formulation and Execution of EU Commercialization Strategy | 15% | 33% |
| Complete Enrollment of CKD-IDA Study | 10% | 100% |
| Regulatory Approval of Additional Contract Manufacturer | 15% | 100% |
| Development of 5-year Strategic Plan | 5% | 100% |
| **Total** | **100%** | |

2016 Preliminary Proxy, at 21-22. (Section heading emphasis in original).

74. As noted in the table, it was a management incentive goal to obtain "Regulatory Approval of [an] Additional Contract Manufacturer." This goal is listed as "100%" achieved. However, as announced on August 1, 2016, Keryx *did not* have any additional, approved contract manufacturers. Indeed, in the August 1 press release, the Company admitted that "Keryx has been working to bring a secondary manufacturer online to supply finished drug product. The company recently filed for approval of this manufacturer with the U.S. Food and Drug Administration (FDA) and the FDA has assigned a Prescription Drug User Fee Act (PDUFA) action date of November 13, 2016." This statement about Keryx achieving regulatory approval of an additional contract manufacturer in 2015 was false and misleading.

***The April 15, 2016 False and Misleading Statements***

75. On April 15, 2016, Keryx filed with the SEC a Definitive Schedule 14A (the "2016 Definitive Proxy"). The 2016 Definitive Proxy contained, on pages 21-22, the identical false and misleading statements and chart as were found in the 2016 Preliminary Proxy and set forth in paragraphs 73-74 above.

***The April 28, 2016 False and Misleading Statements***

76. On April 28, 2016, the Company filed a Form 10-Q, signed by Defendant Holmes, with the SEC. In lieu of restating the *Item 1A Risk Factors* it set forth in its previous quarterly

filings, the Company instead directed investors to the disclosures contained in its Form 10-K filed February 26, 2016, stating that "Information regarding risk factors appears in Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2015."[38] Other than listing additional risks related to its Phase 3 study regarding iron deficiency anemia, Keryx stated that "[t]here have been no material changes from the risk factors previously disclosed in that Annual Report on Form 10-K."[39] As noted in paragraph 71 above, the section of the 2015 Form 10-K investors were referred to contained statements that were false and misleading when made for the reasons set forth in paragraph 72 above.

77. Also on April 28, 2016, the Company issued a press release entitled *Keryx Biopharmaceuticals Announces First Quarter 2016 Financial Results*.

> As a result of our continued focus on commercial execution and fiscal discipline, we met or exceeded all of our internal financial goals in the first quarter and, therefore, are progressing nicely toward achieving our previously stated 2016 full year financial objectives. The passion and commitment that my colleagues at Keryx bring to work each day both in the field and in our home office will drive us to achieve our goals in 2016 and beyond.

78. On April 28, 2016, the Company also conducted a conference call wherein it continued to make false and misleading statements regarding Keryx's ability to reach the financial guidance for 2016 it had released to the market. Defendant Madison stated during the call:

> At the beginning of the year we talked about 2016 as the year of execution. We're off to a good start and with all the pieces in place, we continue to execute. We also outlined the focus areas that will drive Keryx's long term growth and define the path for achieving our vision of becoming a leading renal company.
>
> 2015 was a year of laying the foundation. We established solid fundamentals for Auryxia, including enhancing brand awareness, establishing reimbursement and

[38] Form 10-Q, filed with the SEC on April 28, 2016, at 29.

[39] *Id*.

> late in the year embarking to expand our field based team to 95 sales representatives. As we look ahead in 2016, first on the commercial side, we continue to focus on increasing the adoption of Auryxia in the dialysis setting.
>
> Second, on the medical peer side, we will continue to generate data to support our differentiation to showcase real world Auryxia utilization. And on the development side, we'll define Auryxia's potential in the non-dialysis dependent CKD community and we'll be doing a lot of work to prepare for potential indication expansion.
>
> As we move in to 2017 and beyond, we will remain focused on driving continued adoption of Auryxia in dialysis. At the same time, if we are successful in obtaining approval for the new indication, we'll be ready to bring Auryxia to physicians and their patients with non-dialysis dependent CKD and iron deficiency anemia as quickly as possible. We have tremendous opportunities supported by the positive phase 2 results on IDA to establish a new [grievance] category with Auryxia, enabling us to drive to market leadership.
>
> * * *
>
> We are pleased to report that the fundamental of Auryxia continue to remain strong across physicians, payers and patients. Now consistent with prior quarters we are seeing an increase in the breadth and depth of prescribing, resulting in increased adoption and positive clinical experience of Auryxia. Approximately 70% of Auryxia prescriptions are being paid at the pharmacy and approximately 74% of the co-pays are below $10. Meaning physicians continue to report high patient persistency rates of approximately 70% with no reported discontinuations due to lack of efficacy. With these fundamentals in place, along with the efforts of our expanded sales force ramping over the course in 2016, we are confident in our ability to achieve our net sales guidance.

79. Madison had no basis, on April 28, 2016, to state that he was "confident" in Keryx's "ability to achieve our net sales guidance" as Norwich was beginning to experience problems and Keryx was experiencing supply disruptions in its supplying patients with Auryxia. Madison admitted, on August 1, 2016 that "We had been manag[ing] supply levels efficiently even with increased demand by our field team **in the second quarter**." (Emphasis added.) Madison reaffirmed Keryx's strong guidance on April 28, 2016, more than two months into the second

quarter despite subsequently admitting that Keryx had been managing supply levels of Auryxia due to the problems at Norwich even with the increased demand generated during the second quarter.

**D. The Company Reveals Its Known But Undisclosed Risk**

80. On August 1, 2016, Keryx issued a press release withdrawing its 2016 financial guidance and stating that it was halting the distribution of Auryxia until at least October 2016 due to a production-related issue at the Company's contract manufacturer. The press release stated, in relevant part:

> Keryx Biopharmaceuticals, Inc. (Nasdaq:KERX) today announced that an interruption in the supply of Auryxia® (ferric citrate) tablets is imminent due to a production-related issue converting active pharmaceutical ingredient (API) to finished drug product. Keryx expects to make Auryxia available to patients when supply of Auryxia is back to adequate levels, which Keryx anticipates will be during the fourth quarter of 2016.
>
> "We take our responsibility to patients and the treating community very seriously and recognize the impact this interruption of supply will cause for patients and their healthcare providers," said Greg Madison, chief executive officer of Keryx Biopharmaceuticals. "Our field-based teams have been doing an outstanding job educating the community on the benefits of Auryxia and will be a critical resource during this supply interruption as we continue to support healthcare providers and their patients with hyperphosphatemia."
>
> **About the Supply Interruption**
> Keryx has determined that a supply interruption is going to **occur due to a production-related issue in converting API to finished drug product at its contract <u>manufacturer</u>**. This issue has resulted in variable production yields of finished drug product and, as a result, the company has exhausted its reserve of finished drug product. At this time, current inventories of Auryxia are not sufficient to ensure uninterrupted patient access to this medicine. The supply interruption does not affect the safety profile of currently available Auryxia. Keryx is working with its existing **<u>manufacturer</u>** to resolve the production-related issue and rebuild adequate supply. In addition, since approval of Auryxia in 2014, Keryx has been working to bring a secondary manufacturer online to supply finished drug product. The company recently filed for approval of this manufacturer with the U.S. Food

and Drug Administration (FDA) and the FDA has assigned a Prescription Drug User Fee Act (PDUFA) action date of November 13, 2016. The company expects to restore adequate supply of Auryxia and to make Auryxia available to patients during the fourth quarter of 2016. This supply interruption does not affect the supply of ferric citrate (marketed as Riona®) manufactured and sold by Keryx's Japanese partner.

"**Although we are withdrawing our financial guidance for 2016**, we believe we are well positioned financially to manage through this interruption in supply of Auryxia," said Scott Holmes, chief financial officer of Keryx. "With our strong balance sheet and an appropriately aligned cost structure, we will ensure that we continue to make the necessary investments to emerge from this unexpected event in the best possible position."

**2016 Financial Guidance**
As a result of the supply interruption, Keryx is withdrawing its 2016 financial guidance.

81. Also on August 1, 2016, the Company held a conference call in part to discuss its supply disruption. The Company's representatives reiterated to investors and analysts the statements made in the press release, admitting that it only had a single contract manufacturer and that issues at that sole manufacturer resulted in a complete disruption to the supply of Auryxia. During the call, Defendant Madison additionally admitted that the Company knew about the impending production difficulties for *months*:

Now, let me go into a bit more detail on some of the key areas of the supply interruption and steps we are taking to rebuild supply. We **currently have a single source drug product contract manufacturer**, or CMO. This manufacturer turns active ingredients, or API, of Auryxia into tablets, and they have been successfully producing commercial batches for approximately two years.

***In [the] past few months***, we began experiencing difficulties converting active pharmaceutical ingredients, or API, to finish[ed] drug product, which resulted in variable yields, as compared to our historical rate. We had been manag[ing] supply levels efficiently even with increased demand by our field team in the second quarter.

82. Despite knowing about supply problems for "months", Keryx took no steps to inform shareholders of its "difficulties converting active pharmaceutical ingredients, or API, to finish[ed] drug product." The Company intentionally withheld this information from the market, knowing the adverse effect that it would have on Keryx's value if disclosed.

**E. Analysts Immediately Respond Negatively to the Company's Disclosures**

83. Analysts' reaction to Keryx's August 1 disclosures regarding its single source contract manufacturer was swift, negative and unforgiving. This reaction reinforces both the materiality of the disclosures and the direct correlation between the price drop and the disclosures.

84. On August 1, 2016, the Maxim Group, in a report entitled *Manufacturing Disruptions Will Limit Product Supply; Lowering Rating to Hold from Buy* not only lowered its rating, but also removed its price target for the stock. The firm explained "[w]e are lowering our rating to Hold from Buy based on news that Keryx will now face manufacturing disruption(s) for at least one quarter and possibly more." Maxim Group believed that in the absence of the single manufacturer disclosure, the Company's stock price would likely have *increased*, given that revenue news for the quarter was better than expected. As the report noted, "Keryx did report a strong quarter with revenues of $8.2M above our $6M estimate. Were it not for the disruption, we would have expected to see a 'turnaround' in investor perceptions for Auryxia's long-term sales trajectory." The report concluded that "[j]ust as Auryxia was building traction, it is a disappointment to see a manufacturing disruption. While we believe the long-term picture is still robust and intact, the short term will be difficult and is not predictable. As a result we believe it is prudent to move to a Hold rating (from Buy) and remove our price target."

85. Morgan Stanley also issued a report on August 1, 2016, entitled *Supply Disruption and Manufacturing Issues Overshadow Solid Q2; Remain EW [Equal Weight] on Uncertainties*. Although the firm maintained its rating, it lowered its sales forecasts and considered "continued

manufacturing issues that prevent Auryxia sales in the U.S." as a key risk to Keryx achieving its price target. Morgan Stanley was "concerned about several key uncertainties including (1) the severity of issues at the current manufacturing plant, which may be more significant than a simple scaling/yield issue, (2) potential for delays in approval of the second CMO given manufacturing difficulties as noted during the initial drug review process, (3) uncertainty around time it will take to restock the channels and ultimately provide adequate drug to patients, especially if there are issues with second CMO sNDA, and importantly (4) the unknown impact of the supply disruption on physicians, patients and payors." It also noted that the fledgling Auryxia's prospects "could be materially and irreversibly impacted" by the disclosure of manufacturing issues and the single contract manufacturer.

86. JMP viewed the situation similarly to Morgan Stanley, maintaining its rating but significantly dropping its price target. In a report entitled *Keryx Biopharmaceuticals, Inc. (KERX) Announces Supply Interruption of Auryxia and 2Q16 Earnings Results; Lowering Price Target to $11 from $16*, the firm confirmed that the increased risk diminished the Company's prospects. It noted that "[o]ur reduced price target is primarily attributed to these delays and greater discount rates applied to our valuation methodologies, reflecting increased risks associated with the distribution of Auryxia in the U.S. and EU."

87. Brean Capital also downgraded Keryx on the August 1, 2016 news. In a report entitled *Downgrading to Hold From Buy Until More Clarity on Auryxia Supply Disruption*, Brean noted that "We are downgrading Keryx to Hold from Buy for what we believe will amount to an increasingly difficult time marketing Auryxia during this interruption, and a lack of clarity whether the US sales momentum can resume after the supply issue is resolved. We expect Auryxia sales to

drop significantly during 3Q16 and continue to be weak in 4Q16, as supply confidence may need time to recover from this break."

88. FBR Capital, as reported by Annie Palmer for TheStreet in an article entitled *Keryx Biopharmaceuticals (KERX) Continues to Fall on Disrupted Production*, not only downgraded Keryx's rating, from outperform to market perform, it also slashed its price target from $13 to $7. KBR noted that "the interruption also adds risk to the potential expansion of ferric citrate into iron deficiency anemia in pre-dialysis chronic kidney disease patients" and that FBR's focus shifted "from IDA label expansion to the resolution of the production issue."

89. Even the firms which maintained their rating on the stock expressed significant concern over the August 1 news. J.P. Morgan, in a report entitled *Keryx Biopharmaceuticals 2Q Snapshot and Model Update* and released on August 1, 2016, believed that "the supply hiccup is likely to have a significant impact on [Keryx's] commercial momentum, in our view." Cowen & Co., in their August 1, 2016 report entitled *Manufacturing Issue Leads to Removal of 2016 Auryxia Guidance*, expressed its opinion that "the interruption [is] detrimental to a new brand that is working to build confidence with health care professionals and patients alike." Ladenburg Thalmann, on August 2, 2016 in its report *Auryxia Supply Issue Overshadows Strong 2Q16 Results; Lower PT to $9 from $10* succinctly expressed that "We view this supply interruption as a major disappointment."

**F. Developments Subsequent to the August 1 Corrective Disclosures**

90. On August 5, 2016, the Company filed with the SEC a Form 10-Q for the quarterly period ended on June 30, 2016. The quarterly report stated that:

> On August 1, 2016, we announced that an interruption in the supply of Auryxia tablets is imminent due to a production-related issue. We expect to make Auryxia available to patients when supply of Auryxia is back to adequate levels, which we anticipate will be during the fourth quarter of 2016. We have determined that a supply interruption is going to occur due to a production-related issue in converting

> active pharmaceutical ingredient, or API, to finished drug product at **our contract manufacturer**. This issue has resulted in variable production yields of finished drug product and, as a result, we have exhausted our reserve of finished drug product. At this time, current inventories of Auryxia are not sufficient to ensure uninterrupted patient access to this medicine. The supply interruption does not affect the safety profile of currently available Auryxia. We are working with **our existing manufacturer** to resolve the production-related issue and rebuild adequate supply. In addition, since approval of Auryxia in 2014, we have been working to bring a secondary manufacturer online to supply finished drug product.

91. Thus, the Company corrected its prior misstatements by informing investors that it had only a single contract **manufacturer** to convert API to Auryxia tablets. This qualifying statement was necessary to make the more than twenty references to manufacturers, suppliers and third parties found in the *Risk Factors* section not misleading. This language was *never* included in filings or statements made during the Class Period.

92. On October 12, 2016, more than two months after Keryx revealed that its supply of Auryxia was being interrupted due to problems at Norwich, the Company entered into a Master Manufacturing Services Agreement and two related Product Agreements with Patheon Manufacturing Services LLC ("Patheon" and the "Patheon Agreements"). Under the Patheon Agreements, Keryx agreed to provide Auryxia's API to Patheon, which would convert that API into Auryxia tablets.

## CLASS ACTION ALLEGATIONS

93. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Keryx securities between May 8, 2013, through August 1, 2016, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

94. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Keryx securities were actively traded on the

NASDAQ stock exchange. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. As of April 28, 2016, the Company had 105,820,947 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Keryx or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

95. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a. Whether the Exchange Act was violated by Defendants;

b. Whether Defendants omitted and/or misrepresented material facts;

c. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d. Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e. Whether the price of the Company's stock was artificially inflated; and

f. The extent of damage sustained by Class members and the appropriate measure of damages.

96. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct alleged herein.

97. Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Plaintiffs have no interests that conflict with those of the Class.

98. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

99. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

100. During the Class Period, Lead Plaintiffs and the Class purchased Keryx common stock at artificially inflated prices and were damaged thereby.

101. On August 1, 2016, the Company disclosed that it would withdraw its financial guidance for 2016 and would be halting the distribution of its lone marketed drug due to production difficulties on the part of Keryx's only contract manufacturer, contrary to its public statements made beginning on May 8, 2013, and described above. At the time the market closed on August 1, 2016, the value of shares of the Company's stock declined by $2.64, or 36%, in a single day.

102. This decline is directly attributable to the August 1, 2016 disclosures by Keryx that (1) it had only a single third party manufacturer under contract and approved by the FDA to produce Auryxia which corrected a previously known, but undisclosed risk; (2) the distribution of its Auryxia was being halted because of undisclosed, but known, problems at that sole contract

manufacturer making the financial guidance offered by Madison on April 28, 2016 false and misleading; and (3) it was withdrawing its financial guidance for 2016.

## SCIENTER ALLEGATIONS

103. Defendants' scienter can be inferred from the following facts: Keryx is a small company—with fewer than 200 employees as of August 1, 2016—which sells a single product: Auryxia. It relies on others to convert the active ingredient into a finished product. Any party that Keryx contracts with to convert the API into Auryxia must be approved by the FDA. It is therefore reasonable to presume that each of the Individual Defendants knew throughout the Class Period that Keryx only contracted with a single manufacturer to convert the API into Auryxia. The Individual Defendants either knew, or recklessly disregarded, that Keryx misrepresented to investors that Keryx contracted with more than one third party to convert its API into Auryxia. The Individual Defendants were also aware, from Keryx's pre-class period disclosures, that reliance on a single contract manufacturer would pose risks to Keryx, yet these defendants omitted from disclosure these material facts from their investors. "Regulatory Approval of [an] Additional Contract Manufacturer" was sufficiently central to the Company's success that it was listed as a goal by the Company's compensation committee in the Company's proxy filings. Thus, the Individual Defendants either knew, or recklessly disregarded, that Keryx was attempting to have the FDA approve a second contract manufacturer, yet concealed these material facts from their investors.

104. Defendant Madison either knew, or recklessly disregarded, on April 28, 2016, that his re-affirming Keryx's strong guidance for 2016 sales was false or materially misleading. Defendant Madison admitted, on a conference call with investors and during which Defendant Holmes also participated, that Keryx knew "several months" before August 1, 2016 that Norwich

was experiencing manufacturing difficulties converting the API into Auryxia. On the same call, Madison also admitted that Keryx was managing inventory levels of Auryxia in the second quarter of 2016. Madison provided his positive guidance in the second quarter of 2016 and, when providing his strong guidance, omitted from disclosure the material fact that Norwich was experiencing manufacturing problems.

**FRAUD ON THE MARKET**

105. Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. The omissions and misrepresentations were material;

c. The Company's common stock traded in efficient markets;

d. The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e. Plaintiffs and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

106. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services;

(iii) the Company was regularly followed by stock market analysts who reported on the events at the Company and the Company's stock price reacted to Company specific news. Lead Plaintiffs and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

107. The statutory safe harbor provided for forward-looking statements under certain conditions do not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

108. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## CAUSES OF ACTION

### Count I
### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

109. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

110. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

111. Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii)

engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the Class Period.

112. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Lead Plaintiffs and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**Count II**
**Violation of § 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

113. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

114. The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

115. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

116. As set forth above, Keryx and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

(a) determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiffs as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiffs' counsel as Lead Counsel;

(b) awarding compensatory and punitive damages in favor of Lead Plaintiffs and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

(c) awarding Lead Plaintiffs and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(d) awarding Lead Plaintiffs and the other Class members such other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Lead Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated: February 27, 2017

Respectfully submitted,

**BLOCK & LEVITON LLP**

By: /s/ Jeffrey C. Block
Jeffrey C. Block (BBO# 600747)
Steven P. Harte (BBO# 667948)
Bradley J. Vettraino (BBO#691834)
155 Federal Street, Suite 400
Boston, Massachusetts 02110
Tel: (617) 398-5600
Fax: (617) 507-6020
jeff@blockesq.com
steven@blockesq.com
bradley@blockesq.com

**CERTIFICATE OF SERVICE**

I certify that a copy of this document was forwarded to counsel of record through the Court's ECF system on February 27, 2017.

/s/ Jeffrey C. Block